**UNITED STATES of America, Appellee,**

v.

**Michael A. PINTAR, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Barbara PINTAR, Appellant.**

**Nos. 79–2059, 79–2060.**

United States Court of Appeals, Eighth Circuit.

Submitted June 12, 1980.

Decided Sept. 2, 1980.

Rehearing Denied Oct. 27, 1980.

---

William J. Mauzy, Minneapolis, Minn., for appellant, Barbara Pintar.

Peter J. Thompson, Delaney & Thompson, Ltd., Minneapolis, Minn., argued, John W. Lundquist, Minneapolis, Minn., on brief, for appellant Michael Pintar.

Andrew J. Reich, Dept. of Justice, Public Integrity Section, Criminal Div., Washington, D.C., argued, for appellee. Philip B. Heymann, Asst. Atty. Gen., and Nancy L. Simmons, Atty., Washington, D.C., S. Cass Weiland, Atty., U.S. Dept. of Justice, Washington, D.C., on brief, for appellee.

Before LAY, Chief Judge, STEPHEN-SON, Circuit Judge, and HANSON,* Senior District Judge.

LAY, Chief Judge.

Michael and Barbara Pintar were convicted of conspiracy to defraud the United States, 18 U.S.C. § 371, violation of the Hatch Act, 18 U.S.C. § 600, and four counts of embezzlement, 42 U.S.C. § 3220. Michael Pintar was also convicted of seven counts of mail fraud, 18 U.S.C. § 1341.[1] Michael Pintar was given concurrent sentences of five years of imprisonment for conspiracy, embezzlement and mail fraud and a one year concurrent sentence for the Hatch Act violation. Barbara Pintar received concurrent sentences of 30 months for conspiracy and embezzlement and a 12 month concurrent sentence for violation of the Hatch Act.

---

* William C. Hanson, Senior District Judge, United States District Court for the Northern and Southern Districts of Iowa, sitting by designation.

1. The indictment contained 19 counts. Barbara Pintar was acquitted of all 12 mail fraud counts; Michael Pintar was acquitted on five counts of mail fraud. Both were acquitted of one embezzlement count. Michael Pintar has been incarcerated since February of 1980. In view of our granting him a new trial, we are issuing our mandate forthwith and upon application the district court should grant him immediate release pending a new trial under such conditions and terms as the district judge deems appropriate.

All but six months of Barbara Pintar's sentence were suspended.

The Pintars jointly and severally attack the sufficiency of the indictment, the sufficiency of the evidence and the prejudicial effect of evidence of a kickback scheme not charged in the indictment.[2] We vacate the conviction of Michael Pintar on counts II–VII involving mail fraud violations on the ground that the evidence was insufficient to sustain the convictions. We find the evidence was sufficient to convict Michael of mail fraud on count VIII and sufficient to convict both Michael and Barbara Pintar for violation of the Hatch Act. We likewise find sufficient evidence to convict both defendants for conspiracy to defraud the United States and four counts of embezzlement. However, we find that both defendants were denied a fair trial due to the overall effect of prejudicial evidence; we remand for a new trial for both defendants.

The Upper Great Lakes Regional Commission (Commission) is a federally–funded agency designed to encourage economic development in certain areas of Minnesota, Wisconsin and Michigan. The Commission consists of one federal member, known as the federal co–chairman, and three state members, the governors of the three states. 42 U.S.C. § 3182(b). Each governor is authorized to appoint an alternate to the Commission. 42 U.S.C. § 3182(d). The governors and their alternates are compensated from state funds. 42 U.S.C. § 3182(e).

The Commission provided funds for each governor to appoint a principal staff person to work on that state's regional commission program. Michael Pintar was hired with these funds as Minnesota's governor's representative to the Commission from 1971 to 1977. He was responsible for initial review of grant proposals and recommendation of projects for funding. His assistant project director, also involved in project evaluation,

was Freeman Johansen. Barbara Mategko was employed in 1971 as a secretary for the Commission; she married Michael Pintar in May 1972. The salaries for Johansen and Barbara Pintar were paid directly by the Commission rather than through a grant to the state.

The projects funded by Commission grants included the Northern Minnesota Small Business Development Center (NMSBDC) and Duluth Area Economic Development (DAED). NMSBDC's director was Donald C. Boyd. DAED was directed by Robert Beaudin from December 1973 until his appointment as Mayor of Duluth in January 1975. Michael Pintar then appointed Donald Boyd to fill the DAED vacancy.

Boyd's organizations received approximately $1 million in Commission funds from 1971 to 1977. These grants were given with the recommendation of Michael Pintar, and the grantee was directly responsible to Michael Pintar. Barbara Pintar kept NMSBDC's financial records and was a signatory on NMSBDC's checking account. This was the only grantee for which she wrote checks. On several occasions, NMSBDC hired James Manos as a consultant. Checks to Manos for $11,000 and $25,000 were introduced into evidence; these checks were signed by Mrs. Pintar.[3]

The Pintars and Johansen had offices in a suite in Duluth, Minnesota which they shared with DAED and the Area Redevelopment Administration (ARA), a state–funded economic development agency. Barbara Pintar and the secretaries for DAED, ARA, and NMSBDC shared a common work area in the suite. There was evidence that the Pintars were involved in the hiring and supervision of several secretaries for these other agencies.

**2.** The Pintars also argue that application of the conspiracy, embezzlement and mail fraud statutes to their activities infringes impermissibly on their first amendment rights. We reject this argument. These statutes clearly regulate non expressive conduct, not political expression.

**3.** Donald Boyd was previously convicted of conspiracy to defraud and mail fraud. These convictions were based on Boyd's receipt of kickbacks from Manos from the Commission funds that Manos was paid on his contracts. *See United States v. Boyd*, 606 F.2d 792 (8th Cir. 1979).

The indictment and the evidence at trial focused primarily on allegations that Commission funds were used to pay for partisan political activities. The conspiracy count alleged that the Pintars:

[K]nowingly and willfully combine[d], conspire[d], confederate[d] and agree[d] . . . to defraud the United States of its right to have programs of an agency financed . . . by the United States Government, namely, the Upper Great Lakes Regional Commission, administered honestly, fairly, without corruption or deceit, and free from the use of federal funds to accomplish political objectives, for personal uses, or for other purposes unrelated to legitimate Commission business.

The mail fraud counts alleged a similar effort that included state funds. Both the conspiracy and mail fraud counts enumerated certain activities in furtherance of these schemes, and there was extensive testimony at trial to support many of these allegations. These descriptions of the schemes did not refer to kickbacks.

The Hatch Act count alleged that Sharon Backstrom was hired by the Pintars as a secretary for NMSBDC in consideration for performing political work. The embezzlement counts charged that office space, federal grants, state funds and the services of agency secretaries Shirley Baker, Sheila Ballavance, and Sharon Backstrom were diverted for political functions.

Although we find that there is sufficient evidence to sustain one mail fraud conviction, as well as the Hatch Act, embezzlement and conspiracy convictions, particularly in view of the equivocal evidence on some of those counts, we have concluded defendants' challenge to the overall fairness of their trials based upon the government's introduction of improper evidence requires us to reverse the convictions and grant new trials.

## A. Conspiracy.

The indictment alleges the conspiracy included improper travel claims by Michael Pintar; funding recommendations by Michael Pintar for the Boyd organizations; the hiring of secretaries Shirley Baker and Sharon Backstrom by the Pintars; the hiring of secretary Ann Zweber by Michael Pintar; the Pintars' instructions to Baker, Backstrom and Zweber to perform political functions; political work by the Pintars themselves; and concealment of political activity by the Pintars. The indictment then listed twelve overt acts in furtherance of this scheme. These include the trips by Michael; the interview of Baker by Barbara and her hiring by Michael; Baker distributing Democratic Farmer Labor Party (DFL) raffle tickets, typing DFL precinct caucus lists, collecting Anderson gubernatorial contributions, assisting with an "Octoberfest" campaign function for James Oberstar, and preparing Mayor Beaudin's inaugural invitations, all on the Pintars' directions; and Barbara's offer of employment to Sharon Backstrom and use of Backstrom to obtain lists and address and stuff envelopes for Thomas Berkelman's legislative campaign.

### 1. Existence of a Conspiracy.

Under 18 U.S.C. § 371 conspiracy is defined as an agreement to commit an offense or to defraud the United States, attended by an act of one or more of the conspirators to effect the object of the conspiracy. See *United States v. Skillman*, 442 F.2d 542, 547 (8th Cir.), cert. denied, 404 U.S. 833, 92 S.Ct. 82, 30 L.Ed.2d 63 (1971). The agreement need not be formal or express, *United States v. McCarty*, 611 F.2d 220, 222 (8th Cir. 1979), cert. denied, 4452 U.S. 930, 100 S.Ct. 1319, 63 L.Ed.2d 764 (1980); *United States v. Hutchinson*, 488 F.2d 484, 490 (8th Cir. 1973), cert. denied, 417 U.S. 915, 94 S.Ct. 2616, 41 L.Ed.2d 219 (1974), and may consist of nothing more than tacit understanding, *Nilva v. United States*, 212 F.2d 115, 121 (8th Cir.), cert. denied, 348 U.S. 825, 75 S.Ct. 40, 99 L.Ed. 650 (1954). The existence of the agreement may be shown by circumstantial evidence, including the conduct of the conspirators and any attending circumstances, particularly circumstances indicating that the defendants "acted in concert to achieve a common goal," *Hamling v. United States*, 418

U.S. 87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974). *See United States v. Cox*, 580 F.2d 317, 323 (8th Cir. 1978), *cert. denied*, 439 U.S. 1075, 99 S.Ct. 851, 59 L.Ed.2d 43 (1979); *United States v. White*, 562 F.2d 587, 589 (8th Cir. 1977); *United States v. Hutchinson*, 488 F.2d at 490. Although the defendants need not have knowledge of every detail or phase of a conspiracy, the evidence must show that the conspirators agreed to the "essential nature" of the conspiracy. *Blumenthal v. United States*, 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947); *United States v. McCarty*, 611 F.2d at 222; *United States v. Rosenblatt*, 554 F.2d 36, 39 (2d Cir. 1977).[4]

■ On review, the evidence of agreement must be viewed in the light most favorable to the government, *Glasser ` v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and the court must accept all reasonable inferences which tend to support the verdict. *United States v. Overshon*, 494 F.2d 894, 896 (8th Cir.), *cert. denied*, 419 U.S. 853, 95 S.Ct. 96, 42 L.Ed.2d 85 (1974).

Under these standards, there was insufficient evidence of an agreement as broad as the one described in the indictment. For example, even if Michael Pintar's funding recommendations for the Boyd agencies were made with intent to defraud the United States, there is no convincing evidence of agreement with Barbara Pintar or others. There was no evidence that Barbara Pintar had an official or actual role in the evaluation of funding proposals or in making recommendations. Similarly, there was no evidence of agreement with respect to Michael Pintar's political trips.[5] Although Barbara Pintar picked up his airline tickets and typed travel vouchers for these trips, these tasks are ordinary secretarial functions and do not indicate her participation in a conspiracy. *Cf. United States v. Wrehe*, Nos. 79–1690 to 1692, 628 F.2d 1079, at 1084–1085 (8th Cir. 1980) (non–involvement in decision making; performance of bookkeeping functions insufficient).

■ We conclude, however, there exists sufficient evidence to show a conspiratorial agreement between Michael and Barbara Pintar to direct employees paid with Commission grant funds to perform and conceal political activity during office hours. There was testimony that the Pintars were in a position of at least de facto control over the secretaries in the office suite. Michael Pintar acknowledged that he became the authority in the office due to lack of other leadership. Barbara Pintar was repeatedly identified as the source of instructions to the other secretaries, and in fact she was made office manager in early 1975. This managerial role is reinforced by evidence that the Pintars contacted, interviewed, recommended, and perhaps hired several of the Boyd secretaries, and those for other agencies.[6]

There was strong evidence that the Pintars used these positions of de facto control to direct employees whose salaries were funded by federal grants to perform political work during office hours. Much of the testimony by the secretaries identified Barbara Pintar as the source of the instructions to type DFL materials and letters and envelopes for various political mailings, and there was testimony that Michael Pintar

---

4. *Rosenblatt* deals with the "essential nature" requirement in the context of a section 371 conspiracy to defraud the United States. The court emphasized the necessity of proving agreement as to the essential nature of the plan because "the gist of the offense remains the agreement. . . ." 554 F.2d at 39 (quoting *United States v. Borelli*, 336 F.2d 376, 384 (2d Cir. 1964), *cert. denied*, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965)).

5. Evidence showed Pintar took trips to Omaha and Lincoln, Nebraska, Rochester, Minnesota, and Miami, Florida, which were paid for with Commission funds. Although Pintar claimed

he did some Commission work, the trips were primarily to organize the Humphrey campaign in the 1972 Nebraska presidential primary, to attend the state DFL convention, and to attend the 1972 Democratic National Convention.

6. Michael's supervisory role is indicated by his testimony that he became concerned with the fact the agency secretaries, technically not his employees did not appear busy. The pattern of control is indicated by his response to this concern: Instead of discussing the problem with the agency heads who employed these secretaries, he asked Barbara to see to it that the secretaries looked busier.

also directed the secretaries to perform political work.

Taken alone, this evidence would be insufficient to show agreement, since it shows only individual actions and no concerted effort. There was, however, considerable evidence that the Pintars acted in concert to order performance of political work and to reinforce each other's instructions. This included testimony by Baker and Backstrom that orders to do various political tasks were given by Michael and Barbara together. In one incident, Barbara instructed Backstrom to do political work instead of work for Boyd. Michael overheard Backstrom's complaints and supported Barbara's instructions.

The testimony that the Pintars jointly gave instructions to perform political work was supported by the testimony about the level of political activity in the office, particularly in the Oberstar and Beaudin campaigns. There was testimony that during campaigns the Pintars spent 90 to 95 per cent of their time on political matters, and that this amounted to a majority of their time over the years. Jane Brissett, Oberstar's press secretary, estimated at least half of Oberstar's campaign effort came from the Commission office. She said Barbara told her no government work was being done in the office because of the campaign work and there was other testimony that Commission work was affected. Similarly, during the Beaudin campaign (1975), Backstrom said the office was "completely a political office," and that she spent 75 to 100 per cent of her time on political matters. There was also testimony Zweber worked extensively on the Beaudin campaign.

There was also repeated testimony from the secretaries and their bosses that the political work did not interfere with the secretaries' duties; that they had nothing else to do; and that they were willing to do the political work rather than do nothing. The evidence of willingness is supported by the fact Baker and Ballavance were politically active away from the office. But this testimony does not deny that the Pintars directed the operation, and gave the orders to perform the political work.

We believe the jury could reasonably infer from this testimony that the Pintars reached at least a tacit agreement to use agency employees to perform political work, and that both Pintars knowingly contributed to the furtherance of the conspiracy. There was also proof of numerous overt acts in furtherance of this agreement.[7]

2. Conspiracy to Defraud the United States.

The Pintars argue that a conspiracy as described does not constitute a conspiracy to defraud the United States because there is no proof of gain to them and no proof of harm to the United States. Further, they claim no fraudulent behavior occurred in connection with this conspiracy.

■■■ Initially, we note that the charge is conspiracy to defraud, not an actual defrauding. Second, the cases clearly establish that a conspiracy to defraud the United States need not anticipate cheating the government out of property or money:

To conspire to defraud the United States . . . also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest. It is not necessary that the Government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation,

---

7. There was no testimony by Barbara Pintar or others that she simply carried out Michael Pintar's instructions to tell secretaries to perform political work. The evidence showing Barbara's personal active political support for these candidates, and the large number of instances where she gave instructions tend to show her willing involvement in the scheme. This involvement far exceeds that of defendants who have successfully challenged conspiracy convictions. *E. g. United States v. Blunk*, 561 F.2d 111 (8th Cir. 1977) (insufficient evidence wife was aware of or agreed with the plan). *United States v. Jones*, 545 F.2d 1112 (8th Cir. 1976), *cert. denied*, 429 U.S. 1075, 97 S.Ct. 814, 50 L.Ed.2d 793 (1977) (no direct evidence of wife's involvement in heroin transactions).

chicane or the overreaching of those charged with carrying out the governmental intention.

*Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924).

For example, *Dennis v. United States*, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), involved a conspiracy to submit false affidavits to the NLRB. The Court emphasized that section 371 "reaches 'any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of Government.'" *Id.* at 861, 86 S.Ct. at 1844 (quoting *Haas v. Henkel*, 216 U.S. 462, 479, 30 S.Ct. 249, 253, 54 L.Ed. 569 (1910)). *See also Lutwak v. United States*, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953); *Haas v. Henkel*, 216 U.S. 462, 30 S.Ct. 249, 54 L.Ed. 569 (1910); *United States v. Anderson*, 579 F.2d 455 (8th Cir.), *cert. denied*, 439 U.S. 980, 99 S.Ct. 567, 58 L.Ed.2d 651 (1978); *United States v. Hay*, 527 F.2d 990 (10th Cir. 1975), *cert. denied*, 425 U.S. 935, 96 S.Ct. 1666, 48 L.Ed.2d 176 (1976); *United States v. Jacobs*, 475 F.2d 270, 283 (2d Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 116, 38 L.Ed.2d 53 (1973). Anticipated pecuniary gain to the conspirators is also unnecessary.

■ The evidence must show a scheme to impair, obstruct, defeat or interfere with lawful governmental functions through fraudulent or dishonest means. The Pintars argue there is no proof of such a scheme since all governmental work was performed.

In *United States v. Anderson*, 579 F.2d 455 (8th Cir.), *cert. denied*, 439 U.S. 980, 99 S.Ct. 567, 58 L.Ed.2d 651 (1978), a judge, as financial officer of the county, approved his son's use of employees paid through federal Comprehensive Employment and Training Act (CETA) funds to perform some of the work on fencing projects the son performed on highway projects funded partially by the federal government.

The defendants there argued that there was no conspiracy to defraud since there

was no interference with programs. A highway had been built for the cost anticipated, and workers had received federally funded employment as intended. The court rejected these arguments. "The defendants' actions . . . interfered with the government's interest in 'seeing that the entire project [was] administered honestly and efficiently and without corruption and waste.'" 579 F.2d at 458–59 (quoting *United States v. Hay*, 527 F.2d 990, 998 (10th Cir. 1975), *cert. denied*, 425 U.S. 935, 96 S.Ct. 1666, 48 L.Ed.2d 176 (1976)). Similarly, in *Langer v. United States*, 76 F.2d 817 (8th Cir. 1935), the court approved an indictment charging the Governor of North Dakota and others of conspiring to defraud the United States by requiring employees hired with federal funds to contribute five per cent of their salaries to the Governor's political party for use in publishing a political newspaper. The court found that a conspiracy to defeat application of the funds to their statutory purposes was within the statute. Even if the salaries were not excessive, the court concluded the scheme would obstruct administration because efficiency and morale might be lowered. *Id.* at 824.[8]

■ Here, as in *Anderson* and *Langer*, there is no convincing proof that the government's economic development efforts were prevented, but there is sufficient evidence of a scheme to divert resources from their intended purposes.

We also find that there was sufficient evidence the interference was to be accomplished by fraudulent or dishonest means. There was testimony that the Pintars ordered the secretaries to conceal the political work from a visiting reporter and ordered concealment from other state and local officials. Johansen said Barbara issued general instructions to conceal the work from anyone the secretaries did not trust. Shirley Baker claimed Michael and Barbara told her one reason was that "they didn't want anybody to know that there was political

---

8. Although the indictment was upheld, the court found insufficient evidence for conviction because the evidence dealt mainly with requir-

ing *state* employees to contribute five per cent, not the federally funded employees described in the indictment.

activity going on in that office." While there was testimony that the Pintars had other reasons for concealing their activities, particularly during the Oberstar campaign, this does not foreclose the jury from finding there was a pattern of concealment associated with the diversion of these employees' services.

## B. Mail Fraud.

### 1. Counts II–VII.

Michael Pintar was convicted of seven counts of mail fraud. Three counts (II, IV and VI) involved mailings of written requests for grant funds by Donald Boyd to the special assistant to the federal co–chairman; the grants themselves had previously been approved by the Commission on Michael Pintar's recommendation. Three additional counts (III, V and VII) concerned checks mailed to NMSBDC from the Treasurer of the United States in response to the requests.[9] Count VIII involved a letter from Michael Pintar to the special assistant to the federal co–chairman requesting, on Boyd's behalf, authorization to hire an intern and a secretary in the summer of 1975.

■ Mail fraud consists of two elements, "(1) a scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme." *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); *United States v. McNeive*, 536 F.2d 1245, 1247 (8th Cir. 1976). The indictment described a scheme wherein Michael Pintar recommended grants for the Boyd agencies, and the Pintars hired secretaries for the agencies, and directed them to perform and conceal political activity unrelated to legitimate Commission purposes.[10]

The portion of the alleged scheme to defraud which can be related to these mailings is Michael Pintar's role in the funding process. Under the Commission's funding procedures, applicants for Commission funds would submit proposals. Pintar had the responsibility to review those proposals and make funding recommendations. He usually reviewed proposals with Commission employee Freeman Johansen, although Johansen claimed Pintar never discussed the Boyd grants with him. Pintar's recommendations were not binding, but they were influential with his superiors, the governor ·and the governor's alternate. The evidence is clear that Pintar recommended the funds for the Boyd agencies. The Commission then made grants to Boyd, and Boyd mailed in the three specific requests for checks for the grant money. The Treasury then mailed him three checks. Some of the funds from these checks were used to pay secretaries, including Shirley Baker and Sharon Backstrom, who allegedly performed political work at the Pintars' direction rather than perform their governmental duties for the agencies.[11]

■ To meet its burden of proof, the government must prove that these funding recommendations by Pintar which led to these mailings were part of the scheme to defraud. Schemes to defraud may include schemes to deprive the government and citizens of tangible items such as funds or of intangibles such as the loyal, honest and faithful services of employees. *United States v. McNeive*, 536 F.2d at 1248–50; *see United States v. Rabbitt*, 583 F.2d 1014, 1024 (8th Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). *See also Langer v. United States*, 76 F.2d

---

9. These requests and checks were for $100,000 in 1974 (counts II and III); another $40,000 in 1974 (counts IV and V); and $100,000 in 1976 (counts VI and VII).

10. The indictment described other aspects of the scheme which have no relationship to the mailings in these seven counts, including improper travel by Michael Pintar, political work by the Pintars themselves, and misuse of ARA employees.

11. Shirley Baker was transferred from the ARA payroll to Boyd's NMSBDC payroll in mid 1973. She began work for DAED Director

Beaudin in December 1973. Although she remained on the NMSBDC payroll, the evidence is that DAED was to reimburse NMSBDC for the cost. There was testimony that she did not perform work for Boyd in the months between her transfer and Beaudin's arrival. Her work during that period is not related to the Boyd grants in counts II through VII since the earliest of these grants was in mid 1974. Further, since Baker never worked for Boyd during the period covered by the grants, it can be seriously questioned whether her activities bear any relationship to these mail fraud counts.

817 (8th Cir. 1935). In either case, "[s]ince the term 'scheme to defraud' connotes some degree of planning by the perpetrator, it is essential that the evidence show the defendant entertained an intent to defraud." *United States v. Brown*, 540 F.2d 364, 374 (8th Cir. 1976); *see United States v. Nance*, 502 F.2d 615, 618 (8th Cir. 1974), *cert. denied*, 420 U.S. 926, 95 S.Ct. 1123, 43 L.Ed.2d 396 (1975). A scheme to defraud must seek to deprive the government of these services or funds through fraudulent or deceptive means, such as material misrepresentation, concealment, the breach of a duty to disclose information, or the taking of bribes or kickbacks. *See United States v. McNeive*, 536 F.2d at 1251; *United States v. Brown*, 540 F.2d at 374–75; *United States v. Bush*, 522 F.2d 641, 648 (7th Cir. 1975), *cert. denied*, 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976).[12]

■ While we find that the evidence supported the existence of a conspiracy to divert the services of these employees, we find the Government's proof insufficient to show a scheme to defraud through the mails with respect to Michael Pintar's approval for the overall grant monies obtained by the mailings in counts II through VII. First, there is no proof that the recommendations for grant money were for unnecessary secretarial positions; accordingly, there was no proof that the funding decisions were intended to defraud the government of funds or of anything else. Shirley Baker and Sharon Backstrom, the secretaries in question, had agency work to do. Although the evidence shows there were times when the secretaries had little or no government work to do, this does not refute the fact that their positions were still necessary to the agencies' work and their salaries

were nonetheless properly paid from the grant monies. Second, there is no evidence Michael Pintar had the required intent to defraud when he made his funding recommendations or caused these mailings. Assuming that these positions were unnecessary, there is no proof that Pintar was aware they were unnecessary, and that he nevertheless approved the grants with intent to deprive the United States of tangible or intangible benefits. Evidence relating to the substantial diversion of these secretaries' services for political work fails to show that Pintar had intent to defraud at the time the funds were recommended or requested. Any inference that such intent existed is in our judgment too attenuated.

Finally, there is no evidence of fraudulent behavior in the funding requests. No testimony identified any portions of the grant requests or of Pintar's recommendations that misrepresented the agencies' needs or concealed any facts to the funding body.

The evidence shows that the purpose of the mailings was to arrange for the funding of legitimate Commission work and to provide funds for salaries and other governmental activities. Instead of the mailings being "incident to an essential part of the scheme" or "closely related" to the scheme, *United States v. Boyd*, 606 F.2d 792, 794 (8th Cir. 1979), if anything the evidence shows these mailings were separate acts completed independent of the diversion of secretarial time for political activity. *Cf. United States v. Nance*, 502 F.2d at 618 (scheme to defraud arose after mailings complete, so no mail fraud violation). On this basis we find the evidence insufficient to sustain Michael Pintar's conviction for mail fraud under counts II–VII.[13]

---

12. In *Bush*, the court concluded that a mere breach of fiduciary duty depriving the city of honest and faithful services of its employee could not constitute a scheme to defraud without material misrepresentations and concealment. Similarly, in *McNeive* the court relied on *Bush* in concluding that even if the scheme was designed to deprive the government of honest and faithful service, there was no section 1341 violation in the absence of a showing of misrepresentation or concealment.

13. We are indeed troubled over the multiplicity of counts contained in the indictment. In effect the mail fraud counts relate to obtaining government funds under false pretenses. Assuming there was sufficient proof of intent and misrepresentation, this alleged fraud appears duplicitous with the four embezzlement counts. A serious question arises as to whether Michael Pintar could be punished for obtaining the funds under false pretenses and also for diverting or embezzling the same funds by misusing the secretarial time. An individual cannot be punished for larceny (obtaining money by false

2. Count VIII.

We view Michael Pintar's conviction for mail fraud under count VIII in a different light. Count VIII claims a separate scheme to defraud the government based on Pintar's request for specific funds to hire intern John Muldoon and secretary Ann Zweber.

In contrast to counts II through VII, we find sufficient evidence for a jury to find a scheme to defraud here. Boyd testified that Michael Pintar told him he wanted DAED funds to hire a secretary in the summer of 1975 although Boyd had no need for another employee at that time. Ann Zweber was then hired with the DAED funds requested by Michael Pintar in the letter specified in count VIII. During the approximately two months Zweber was in the office she performed some work for the Commission, such as answering the phone and handling the mail during the absence of Barbara Pintar, who had surgery that summer. She did not work for DAED, which paid her salary. When not answering the phone or handling Commission mail, she worked exclusively on Beaudin's mayoral campaign, doing scheduling and preparing a chart of appointive offices the mayor could fill.

We find sufficient evidence to sustain an inference of a scheme to defraud the government on this count. Intent to defraud is supported by the request for funds by Pintar despite the lack of any need for the employee or any request from the project director. Further support is provided by the fact that Zweber did not perform DAED work and instead spent most of her working hours for a political candidate who was supported by Michael Pintar. The deceitful element necessary in a scheme to defraud consists of the misrepresentation in the letter as to Boyd's need for additional employees. Assuming that a scheme to defraud was proved, Michael Pintar conceded that the mailing requesting the funds to hire Zweber was for the purpose of executing the scheme. We therefore sustain the conviction on count VIII.

C. Embezzlement and Misapplication of Funds.

The Pintars were convicted of four counts of violating 42 U.S.C. § 3220(b), which prohibits any person "connected in any capacity with the Secretary, in the administration of [the Public Works and Economic Development Act of 1965]"[14] from embezzling, abstracting, purloining, or willfully misapplying money or other things of value. Count XV involves the use of funds, office space and Shirley Baker's services to address and mail invitations for the inauguration of Robert Beaudin in January 1975; testimony showed Baker and Ballavance spent two to three days mailing approximately 1,000 invitations, Barbara and Michael Pintar worked on the invitations, and Commission stamps were used for mailings (although Barbara and Beaudin denied the use of Commission funds). Count XVI deals with activity in support of Beaudin in his 1975 campaign for mayor, including the use of Sheila Ballavance's services. According to Ballavance, she typed an estimated 1,000 invitations to a fund raiser; this assignment was given by both Barbara and Beaudin's campaign manager. Backstrom said she spent a substantial majority of her time working on the Beaudin campaign, and that at Barbara Pintar's direction she typed several hundred thank you notes to persons who contributed at the fund raiser.

pretenses) and embezzlement of the same funds. *Cf. Milanovich v. United States,* 365 U.S. 551, 81 S.Ct. 728, 5 L.Ed.2d 773 (1961). Since a retrial is necessary as to the embezzlement counts, and not the mail fraud counts (except count VIII), the problem will not arise in event the government decides to go ahead with a new trial.

**14.** Section 3220(b) states in part:

Whoever, being connected in any capacity with the Secretary, in the administration of this chapter (1) embezzles, abstracts, purloins, or willfully misapplies any moneys, funds, securities, or other things of value, whether belonging to him or pledged or otherwise entrusted to him

. . . . .

shall be punished by a fine of not more than $10,000 or by imprisonment for not more than five years, or both.
42 U.S.C. § 3220(b).

Ann Zweber also spent approximately two months in the office working primarily on Beaudin matters.

Count XVII deals with the preparation of DFL precinct caucus lists by Ballavance and Backstrom. Both secretaries testified that they typed these lists on instructions of Barbara Pintar. There was also testimony that Donald Bye, a DFL activist, distributed these lists with the approval of Michael and Barbara Pintar. Count XVIII deals with efforts for the Berkelman legislative campaign, including the services of Sharon Backstrom. Backstrom testified she did "many weeks of work" on the Berkelman campaign in 1976; that Barbara gave her lists of names and told her to type envelopes; that on four to six occasions Barbara sent her to pick up or return lists of names at the county welfare office; that some envelopes were stuffed with political material in the office; and that she typed 1500–2000 envelopes for mailing Berkelman brochures. Backstrom also said that several times Barbara asked Boyd for a check for postage, and that the check was then used by Barbara or herself to buy stamps, envelopes or stationery for political mailings. When the work was completed, Backstrom said she would always return it to Barbara. When Backstrom protested being required to do this work, Michael Pintar told her she was hired to do political work. Berkelman and Barbara denied that this work occurred, but the jury had sufficient evidence to conclude that substantial work was performed in the office.

The Pintars challenge these convictions on several grounds. They claim there is a lack of proof of fraud or personal gain.[15] As discussed above, there was evidence of concealment in connection with the diversion of employee services. Assuming proof of fraud is necessary, this suffices. It also corroborates the inference that the misapplication was willful. Personal gain is not stated as a requirement under this statute. Even if personal gain is required, the Pintars gained by obtaining the employees' services for political candidates they supported. Employee services can be "property" or "things of value". *See United States v. Coleman*, 590 F.2d 228, 231 (7th Cir. 1978), *cert. denied*, 440 U.S. 980, 99 S.Ct. 1786, 60 L.Ed.2d 239 (1979) (CETA employees used to perform political activities and assist in defendant's construction business; conviction on charge defendant embezzled, willfully misapplied, stole, or obtained by fraud affirmed).

The Pintars also argue that they are not "connected in any capacity with the Secretary [of Commerce], in the administration of [the Act] . . . .", 42 U.S.C. § 3220(b). We disagree. The broad language "connected in any capacity" covers employees like the Pintars. Michael was hired by the state with funds provided by the Commission to assist in evaluating and administering Commission projects. Barbara had an even closer tie to the Commission since she was a Commission employee paid directly by the Commission and assigned to Minnesota to assist in administering the program.[16]

D. The Hatch Act.

The Hatch Act provides:

Whoever, directly or indirectly, promises any employment, [or] position . . . provided for or made possible in whole or in part by any Act of Congress, or any special consideration in obtaining any such benefit, to any person as consideration . . . for any political activity . . . shall be fined not more than

---

15. "[E]mbezzlement is '. . . the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come.'" *Groves v. United States*, 343 F.2d 850, 854 (8th Cir. 1965) (quoting *Moore v. United States*, 160 U.S. 268, 269, 16 S.Ct. 294, 295, 40 L.Ed. 422 (1895)).

16. The Pintars point out that 42 U.S.C. § 3186 says that only the federal co chairman, his staff and his alternate, and certain temporary employees are to be considered federal employees for any purpose. However, section 3220(b) does not limit its scope to federal employees, but reaches anyone who is connected in any capacity, whether or not they are federal employees.

$10,000 or imprisoned not more than one year, or both.

18 U.S.C. § 600.

The evidence showed Sharon Backstrom was hired by Barbara and Michael Pintar as a secretary to work for Donald Boyd. Having learned of Backstrom's availability, Barbara called her at home and asked if she was interested. Upon receiving an affirmative response, Barbara told her "she was very pleased she was getting someone who was a DFL politically—oriented person, that they couldn't go through the normal screening for hiring for the employment agency looking for a political DFL person." Backstrom said Barbara told her she "would be working for Don Boyd, but I would be doing political work." They discussed salary and Barbara said Backstrom would have to talk to Michael and asked her to come in the next day for an interview. Backstrom came in, reached an agreement on salary, and began work July 11, 1975. Backstrom said Donald Boyd, her supposed employer, was not present and she did not meet him for at least three weeks.

Backstrom understood she would be doing political work. She spent 100 per cent of her time on politics the first few weeks, and 75–90 per cent until November.

Donald Boyd denied interviewing Backstrom, and said she was put on the payroll on Michael's recommendation. He believed it was some weeks after she was hired until he met her.

■ This testimony would permit the jury to conclude that Barbara discussed the job with Backstrom on the telephone, conducted the official interview the next day, told Backstrom political work was involved, and recommended to her husband the hiring of Backstrom.

Even though Barbara probably did not hire Backstrom, her acts could fall within the statute. The statute refers to "[w]hoever, *directly or indirectly, promises* any employment . . . *or any special consideration in obtaining any such benefit . . .*" *Id.* (Emphasis added). Barbara searched for the employee, conducted the interview, and made the recommendation. At a minimum, she appears to have given "special

consideration" to Backstrom in consideration for political activity. The most reasonable inference is that Michael did the official hiring on Barbara's recommendation. He later showed his understanding of Backstrom's obligation to perform political work when he told her she had been hired to do political work and that if she did not like it she could leave.

We are satisfied there exists sufficient evidence for a jury to find that both Barbara and Michael Pintar promised employment as consideration for Backstrom's performance of political work. This violates the specific provisions of the Hatch Act.

E. Prejudicial Evidence.

■ The indictment does not allege a kickback scheme. The defendants sought to learn from the beginning of the trial, by way of a bill of particulars, whether the government intended to prove a kickback scheme. The defendants' motion for a bill of particulars was overruled; throughout the trial the defendants asserted there was no personal gain proven by way of a kickback scheme and at no time did the government challenge this contention. On the final day of the prosecution's case, the government announced its intention to prove that kickbacks were received by Michael Pintar. The trial court ruled at this juncture that evidence of kickbacks would not be received because such evidence would fall outside the indictment. Nonetheless, the defendants assert that four distinct incidents unfairly implied that they were engaged in a scheme of taking kickbacks.

1. Ballavance's Testimony.

Ballavance, a former secretary for the ARA, testified that secretarial time had been substantially diverted from the agency projects and government work. On cross—examination Barbara Pintar's counsel attempted to show Ballavance's extreme dislike for Barbara Pintar. Ballavance testified that Barbara Pintar gossiped about Ballavance's husband, was "pushy" and, in her opinion, Barbara Pintar did not have authority over her department. Ballavance also stated she suspected the Pintars had

prevented her husband from getting a job as campaign manager in Oberstar's campaign. On redirect examination, government counsel asked: "Was there any other reason that you harbored this dislike [for Barbara Pintar]?" She answered: "I distrusted both Michael and Barbara Pintar. I distrusted their operation in the office. I felt that there was a kickback scheme going on in the office that I felt they were a part of." She was then allowed to say she based her belief on four or five checks she found written to James Manos, a consultant to NMSBDC, totalling $60,000 to $80,000. She stated she questioned Manos' ability to earn this kind of money.

The government claims that Ballavance's statements were admissible for the purpose of rehabilitating the witness after the cross–examination exposed Ballavance's dislike for the Pintars. Assuming that rehabilitation may,[17] under some circumstances, be a proper purpose for the introduction of other crimes evidence, a more fundamental question is whether Ballavance's testimony was relevant to that purpose. Relevant evidence has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable . . . ." Fed. R.Evid. 401. Here, the fact raised in cross–examination was Ballavance's dislike for the Pintars. Relevant evidence on behalf of the prosecution would tend to make that fact less likely. Instead, on redirect, Ballavance stated an *additional* reason for the defendants' claims of bias. One noted authority maintains that such evidence is inadmissible.

When to a witness is imputed hostility to the opponent, the true process of ex-

planation consists in showing that the facts offered do not really indicate the conclusion suggested, i.e., the hostility. Thus, when the counterevidence does not attempt to do this, but admits the hostility and desires to show that it was *justifiable by the opponent's conduct,* the offer is improper in two ways, first, because it does not at all explain away, but concedes that hostility exists, and, secondly, because it tends to prejudice unfairly the cause of the opponent by showing him to be an unjust man. For these reasons such evidence may be excluded.

3A J. Wigmore, Evidence § 952, at 799–800 (Chadbourn Rev. 1970) (footnotes omitted).

The United States argues that the evidence is admissible even though it does not rebut the implication of bias. They claim the matter was opened on cross–examination and may then be explained under the doctrine of verbal completeness. Standard definitions of the doctrine of verbal completeness indicate it has no application here. The doctrine ordinarily is used to permit the witness to complete verbal statements that are presented in an incomplete manner by the opponent. *See generally* 7 J. Wigmore, *supra* at § 2094 (Chadbourn Rev. 1978); McCormick on Evidence § 56 (2d ed. 1972).[18] In this case, there were no prior verbal statements by the witness that were partially presented by the defense. The government also argues that the cross–examination opened up the matter. *See United States v. Vaughn,* 486 F.2d 1318 (8th Cir. 1973). We disagree. Rule 401 requires that the redirect serve some relevant purpose other than providing additional details about a matter opened up on cross–examination.[19]

---

**17.** There is some support that rehabilitation can be a proper purpose under Rule 404(b). *See United States v. Jones,* 545 F.2d 1112, 1115 (8th Cir. 1976), *cert. denied,* 429 U.S. 1075, 97 S.Ct. 814, 50 L.Ed.2d 793 (1977). Rule 404(b) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation,

plan, knowledge, identity, or absence of mistake or accident.

**18.** Fed.R.Evid. 106 expresses the rule of verbal completeness:

When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

**19.** This testimony could be probative of defend-

2. Cross–Examination of Michael and Barbara Pintar.

Discussion of the kickbacks also arose in extensive cross–examination of Michael Pintar. Pintar's relationship with Boyd and Boyd's connection to Manos were discussed. There followed a series of questions asking whether Boyd or Manos gave Pintar loans, political contributions, or gifts. In connection with these questions, Pintar was shown checks written by Barbara Pintar on the NMSBDC account to Manos for $11,000 and $25,000. Before Pintar's cross–examination, Ballavance had stated that she suspected kickbacks because Manos was receiving large, undeserved payments.

Since this cross–examination raises allegations of wrongdoing short of a prior conviction of crime, it is governed by Fed.R. Evid. 608(b).

Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired to on cross–examination of the witness . . . concerning his character for truthfulness or untruthfulness.

. . . . .

Past conduct of a witness can be probative of truthfulness or untruthfulness. *United States v. McClintic,* 570 F.2d 685, 690–91 (8th Cir. 1978) (cross–examination about a previous attempt to sell a $200 ring for $8,000 was permissible since it dealt with a prior swindle reflecting on the defendant's character for truthfulness); *United States v. Brown,* 547 F.2d 438, 444–45 (8th Cir.), *cert. denied,* 430 U.S. 937, 97 S.Ct. 1566, 51 L.Ed.2d 784 (1977) (a police offi-

cer's failure to report the serial numbers of an allegedly stolen motorcycle and his claim that he could not find the numbers were acts of misconduct reflecting on his character for truthfulness). In contrast, we have approved trial courts' refusals to allow cross–examination about a witness's offer to pay to have her husband killed, *United States v. Young,* 567 F.2d 799, 803 (8th Cir. 1977), *cert. denied,* 434 U.S. 1079, 98 S.Ct. 1273, 55 L.Ed.2d 786 (1978), or about armed robbery, or a less than honorable discharge from the Marines for failure to wear a uniform, *United States v. Hastings,* 577 F.2d 38, 40–41 (8th Cir. 1978).

In this case the questions center on requiring or accepting kickbacks from funds appropriated to NMSBDC. By receiving kickbacks from the funds granted to NMSBDC on his recommendation, Pintar would have deceived the United States as to the ultimate purpose and use of the funds. Thus, the questions regarding demands for and receipt of the kickbacks would have some relevance to Pintar's truthfulness.

■ However, even when the matter is relevant to truthfulness the questions may be improper if the prejudice exceeds the probative value. *United States v. Burch,* 490 F.2d 1300, 1302–03 (8th Cir.), *cert. denied,* 416 U.S. 990, 94 S.Ct. 2400, 40 L.Ed.2d 769 (1974). A great deal of evidence had already been introduced to show the Pintars' willingness to divert government funds for improper purposes. The additional probative value of questions about the alleged kickbacks is highly questionable. Regarding their prejudicial effect, the series of cross–examination questions painted the picture of kickbacks more clearly than any other discussion or testimony in the trial. These questions plainly suggested that Manos was receiving grant funds and that Boyd or Manos was making kickbacks to Pintar out of these funds.[20] This was

---

ants' intent to divert government funds. The fact that both the taking of kickbacks and misappropriation of secretarial time involved diversion of federal grant money for political purposes would seem to meet the "similar crimes" test, and the incidents in this case were close in time. There are two apparent difficulties with this theory. First, the government did not argue that the Ballavance testimony showed intent or a scheme, but instead persist-

ed with the "rehabilitation" argument. Second, even if the testimony were probative, the vagueness and uncertainty of Ballavance's "suspicion" demonstrates the "clear and convincing" requirement was not met.

20. Similarly, in the cross examination of Barbara Pintar, objections to the following questions were overruled:

particularly true because the checks to Manos were used in the questioning. As in *Burch,* this put undue emphasis on "the crime for which no conviction had been obtained." This is of particular concern where, as here, the witness being cross–examined is the defendant, *see* J. Weinstein & M. Berger, 3 Weinstein's Evidence ¶ 608[06], at 608–30 (1978). Rule 404(b) carefully excludes direct evidence of other wrongdoing unless the tests, including the requirement of clear and convincing proof, are met. By permitting accusations that could not be proven under 404(b) to be raised by means of suggestive questions, 404(b) is subverted.

### 3. $1,000 Loan to Pintar from Boyd.

Before any testimony regarding kickbacks, Freeman Johansen testified that Michael Pintar asked Boyd for $1,000 for a trip to Las Vegas. Johansen did not use the word "loan." He said he later saw Boyd hand Pintar an envelope; Pintar subsequently told Johansen the money was in a file drawer and could be used for purposes such as for petty cash or the purchase of supplies. Johansen later saw an envelope with money in it in the file drawer.

> Q. Do you know if [Michael Pintar] ever asked Donald Boyd for a political contribution?
> Q. Do you know if he ever asked or sought a political contribution from Mr. Manos, Mr. Boyd's consultant, whom you have mentioned earlier?

In .a different context, dealing with leading questions in the cross–examination of a character witness, this court has noted the undue prejudice which can result from the damaging implication inherent in questions relating to alleged acts of defendant's misconduct. In *Gross v. United States,* 394 F.2d 216, 222 (8th Cir. 1968), *cert. denied,* 397 U.S. 1013, 90 S.Ct. 1245, 25 L.Ed.2d 427 (1970), we observed:

The rule permitting the cross–examiner to ask the character witness whether he "has heard" of the particular crimes or acts which might indicate a bad reputation exists only for the limited purpose of impeaching the witness on the stand by testing his knowledge and credibility. Without the meticulous and careful guidance of the trial judge, however, the jury may well not understand the purpose at all. They may take the question and its reference to specific acts or crimes as bearing directly upon the character of the defendant and his propensity to commit crime. They may take as established the truth of the inferences contained in the ques-

Michael Pintar denied receiving a loan or any other funds from Boyd or Manos. The government then called Boyd as a rebuttal witness. Boyd testified that Pintar asked him for a loan of $1,000 and that he gave it to him.

The Pintars argue this evidence implies kickbacks, not a loan, and was therefore inadmissible under Rule 404(b), as evidence of other crimes or wrongdoing. The United States claims this was evidence of a loan, admitted to show the close relationship between Boyd and Michael Pintar, and that since a loan is neither illegal nor a bad act, Rule 404(b)'s standards need not be met.

The testimony was ambiguous as to the nature of this $1,000 payment. Standing alone the evidence was not prejudicial. The defendants' concern is that when combined with the other testimony concerning kickbacks, particularly the references to the $1,000 in Michael Pintar's cross–examination, the jury would view it as a kickback.[21] The mere fact that Boyd said it was a "loan" did not necessarily make it so, especially since Boyd was shown to be "incarcerated."[22] The Government's use of Boyd as

tions. Such use would circumscribe directly the careful rule designed to prevent this highly prejudicial use of such evidence and "strike the accused under the cloak of impeachment of the witness." *Shimon v. United States,* 1965, 122 U.S.App.D.C. 152, 352 F.2d 449, 454; 3 Wigmore, Evidence § 988 (3rd Ed.). When such a result is combined with an imputation of truth in the question propounded by a respected public official, manifest unfairness is the result.

**21.** The prosecution's cross examination of Michael Pintar included an explicit discussion of the $1,000 "loan" from Boyd. This was followed immediately by the questions about receiving money from Boyd or Manos. For example:

> Q. Did you receive any of the proceeds of [the $11,000 check] . . . for political payments or as a political contribution, as a personal loan, as a personal gift, or for any purpose?

**22.** The fact that Boyd was shown to be incarcerated, standing alone, was not improper. However, once this fact was disclosed it merely highlighted the previous suggestive effect of the alleged kickback scheme.

a rebuttal witness concerning the $1,000 loan simply added fuel to the prejudice surrounding the suggested Boyd–Pintar kickbacks.

*Conclusion.*

At the close of the Government's case, the Government attempted to call Boyd to show through his testimony that the defendants were involved in a kickback scheme. The court, quite properly we think, ruled the kickback charge was not within the indictment. The court indicated the defense had made diligent efforts to determine if this was a kickback case and it was never presented as one.

Nevertheless, kickbacks came before the jury as a result of the Ballavance testimony and the cross–examination. The potential prejudice of Ballavance's redirect examination was substantial. Although in isolation this was a single mention of kickbacks, and the court cautioned the jury the evidence was admissible only as to Ballavance's reasons for bias, nonetheless, the cross–examination of Michael Pintar and Barbara Pintar left no doubt that the government was attempting to infuse into the trial an extensive kickback scheme. The prejudice is emphasized by the fact the testimony by Ballavance did not duplicate direct and properly admitted evidence of kickbacks; it was corroborated only by the implications raised in the cross–examination. This prejudice must be balanced against the low probative value, caused primarily by the fact Ballavance expressed a mere suspicion.

Evidence of kickbacks smacks of fraud, whereas evidence of the use of secretarial help to conduct political activities, especially evidence which shows that the secretaries had much free time and their political work did not seriously impede that of the governmental agency, only marginally reflects deceit. It is fundamental that unless evidence meets standards of relevant proof it is inadmissible. It is even more fundamental that if the evidence was minimally probative to the issues of the case, and if its prejudicial effect so outweighs its evidentiary value, a defendant in a criminal trial may be denied a fair trial on the charges made. We think it obvious this happened here.

Michael Pintar's convictions on counts II through VII are vacated and the cause is remanded with direction to enter a judgment of acquittal on those counts; new trials on all other counts upon which Michael and Barbara Pintar were convicted are hereby ordered and the cause is remanded. We order the issuance of the mandate forthwith.