**UNITED STATES of America, Appellee,**

v.

**Tommy SWAREK, Appellant.**

**No. 80–2045.**

United States Court of Appeals, Eighth Circuit.

Submitted March 11, 1981.

Decided Aug. 12, 1981.

Rehearing and Rehearing En Banc Denied Sept. 14, 1981.

Certiorari Denied Nov. 9, 1981.
See 102 S.Ct. 573.

---

George W. Proctor, U. S. Atty., Little Rock, Ark., Fletcher Jackson, Asst. U. S. Atty., Little Rock, Ark., argued, for appellee.

Patrick H. Hays, North Little Rock, Ark., Samuel A. Perroni, Little Rock, Ark., argued, for appellant.

Before HEANEY, HENLEY and McMILLIAN, Circuit Judges.

HENLEY, Circuit Judge.

Tommy Swarek, appellant, was indicted and charged with conspiring to defraud or commit an offense against the Small Business Administration (SBA), an agency of the United States, in violation of 18 U.S.C. § 371. After a jury trial a guilty verdict

was returned and judgment entered accordingly. Appellant was sentenced to four years imprisonment, with three and one-half years suspended, and placed on probation for three and one-half years. On appeal he contends that (1) the evidence was insufficient to support the jury's verdict; (2) the district court erred in admitting certain evidence; and (3) the district court erred in denying him a fourth continuance. We find each of these contentions meritless and affirm the judgment of the district court.[1]

The SBA is empowered, pursuant to 15 U.S.C. §§ 681, 687, to license and regulate investment companies organized to provide financing for small business concerns. To provide these investment companies financial assistance, the SBA can purchase debentures or stock issued by them. The amount purchased, however, may not exceed a specified percentage of the investment company's total paid in capital and paid in surplus. This percentage increases when the sum of the paid in capital and paid in surplus is $500,000.00 or more. See 15 U.S.C. § 683(c). In the present case, appellant Swarek and one William R. Smith, Sr. were accused[2] of agreeing to falsely represent to the SBA that the total paid in capital and paid in surplus of Venture Capital, Inc. (Venture) exceeded $500,-000.00.

■ "In reviewing a jury verdict on appeal, we are required to view the evidence in the light most favorable to the government, and we accept as established all reasonable inferences to support the conviction." *United States v. Nelson,* 603 F.2d 42, 48 (8th Cir. 1979) (citations omitted). With this in mind, we set down the events leading to Swarek's conviction.

Venture is an investment company licensed by the SBA under 15 U.S.C. § 681(d). In the summer of 1977 a majority of its

---

1. The Honorable Elsijane T. Roy, United States District Judge, Eastern and Western Districts of Arkansas.

2. Swarek and Smith were indicted and charged as codefendants. Smith, due to physical and

mental infirmities, for a time was unfit to stand trial. For that reason, the charges against him were severed and tried at a later date. The present appeal concerns only the charges against Swarek.

stock was purchased by William R. Smith, Sr. and his son. Prior to this acquisition, Smith, Chairman of the Board at Citizens Bank of Tillar, Arkansas, had become acquainted with appellant Swarek. Citizens Bank had loaned money to several of the many businesses owned by Swarek.

Swarek was the sole shareholder of ARK–LA–TEX, a corporation he formed to handle his multifarious business activities. Among ARK–LA–TEX's claimed assets were a movie entitled "Waterloo" and a non-operating oil refinery. Swarek, apparently wishing to sell both the movie and the refinery, in September, 1977 contacted Jim Feazell and Gene Housley respectively. Swarek told Feazell that he negotiated an approved loan for Venture, and that if Feazell would form a corporation to purchase the movie that Venture would provide the financing. Similar representations were made to Housley concerning the purchase of the refinery. With Swarek's assistance, Feazell formed Arkansas Motion Picture, Inc. (Motion Picture) and Housley formed Oil Cleaning, Inc. (Oil Cleaning). In reality, Swarek was not authorized to negotiate and approve loans for Venture. Nonetheless, both Motion Picture and Oil Cleaning entered into purchase agreements with ARK–LA–TEX contingent on Venture financing.

While negotiating with Feazell and Housley, Swarek discussed with Smith the possibility of Venture providing the approximately $400,000.00 needed to finance the proposed sales. At that time Venture's paid in capital was only $297,000.00. Smith indicated, however, that additional capital sufficient to finance the sales could be raised via a loan from Planters Savings and Trust Bank of Opelousas, Louisiana (Planters). Swarek was attracted by this idea and agreed to assist Smith in securing the loan.

On October 21, 1977, during the time that Smith and Swarek were negotiating the loan, Venture, Motion Picture and Oil Cleaning each opened a checking account at Planters. Soon after opening these accounts, Motion Picture and Oil Cleaning each wrote an undated check to ARK–LA–TEX for $200,000.00 and gave it to Swarek. Neither account had funds sufficient to cover these checks at the time they were written and they were held by Swarek. In return for these checks ARK–LA–TEX sold the movie and refinery while retaining a security interest in each asset. Neither security interest was filed on public record until after the SBA began its investigation.

On November 2, 1977 Smith presented his loan application to Planters' loan committee. The plan presented by Smith, and developed with Swarek's aid, was as follows: (1) Planters loans $400,000.00 to Smith personally; (2) Smith uses that $400,000.00 to purchase 80,000 shares of Venture stock, increasing Venture's paid in capital from less than $500,000.00 to $697,000.00; (3) Venture then uses the $400,000.00 of new paid in capital by loaning Motion Picture $200,000.00 and Oil Cleaning $200,000; (4) Motion Picture and Oil Cleaning use the money to purchase the movie and the refinery from ARK–LA–TEX; (5) ARK–LA–TEX then writes a check to Farm and Home Mortgage Co. (Farm and Home), a Swarek corporation, for $400,000.00; (6) Farm and Home then uses the $400,000.00 to purchase a certificate of deposit from Planters; (7) the certificate of deposit and the 80,000 shares of Venture stock are then used to secure the $400,000.00 loan from Planters to Smith.

Smith, on November 3, 1977, notified the SBA that Venture was increasing its paid in capital beyond $500,000.00 and wished to apply for funding. On November 7, 1977 Smith's loan application to Planters was approved. Immediately upon receiving the loan he deposited the proceeds in Venture's checking account at Planters. Venture then wrote both Motion Picture and Oil Cleaning a $200,000.00 check. Swarek, using the checks he was holding from Motion Picture and Oil Cleaning, then moved the money to ARK–LA–TEX's checking account. These transactions occurred on the same day, and since all of the accounts were at Planters the money never left the bank; these were paper transactions only. At the request of Swarek and Smith, a loan

officer for Planters, in connection with Venture's application for funding, wrote the SBA that same day informing it that Venture had more than $500,000.00 on deposit in a demand checking account.

According to plan, Swarek, on behalf of ARK–LA–TEX, wrote a $400,000.00 check to Farm and Home which used this money to purchase a certificate of deposit at Planters. This certificate of deposit, along with the 80,000 shares of Venture stock, was placed at Planters as collateral for Smith's loan.

Some other facts concerning the above transactions are noteworthy. The loan checks written from Venture to Motion Picture and Oil Cleaning were concealed from Venture President, Charles Sims. Although Sims assisted in completing the funding application and was aware that Venture was increasing its capital, he was not informed of the source of or proposed use of that capital. At the request of Smith and Swarek, Ron Pruner, a Planters' employee, agreed on November 7, 1977 to act temporarily as Venture Vice President. His only corporate act before resigning on November 18, 1977 was to write the loan checks.

Although Motion Picture and Oil Cleaning each gave Venture a promissory note for more than $200,000.00, no payments have ever been made on the loans. Indeed, Swarek at one time told Feazell not to worry about the Motion Picture loan because he would make any payments that came due. Finally, the role played by Farm and Home merits mentioning. Farm and Home was a corporation formed by Swarek in which he placed certain assets to shield them from attachment. It had no bank accounts and transacted no corporate business. Morgan Daniels, the named president of Farm and Home, testified that he had no power in the corporation, and that although he purchased the certificate of deposit it was only upon Swarek's request. Swarek, who owed Daniels $75,000.00, assured him that purchasing the certificate would enable him to pay the debt. The debt was never paid.

On November 18, 1977 Smith and Sims met with SBA officials and presented Venture's application for funding. The application indicated that Venture had recently received $400,000.00 in paid in capital increasing its total paid in capital to over $500,000.00, of which it was contemplating loaning approximately $200,000.00 to Oil Cleaning. No mention was made of a loan to Motion Picture. Based on the information before it the SBA agreed to provide funding to Venture. Actually, Venture had already, on November 7, 1977, loaned the $400,000.00 to Motion Picture and Oil Cleaning. These loans were not reported to the SBA until April, 1978.

Two disbursements were made by SBA, the first on December 23, 1977 for $150,-000.00 and the second on January 13, 1978 for $547,000.00. This money was deposited in Venture accounts at Smith's bank, Citizens Bank of Tillar, Arkansas. Soon after the money was deposited, most of it was loaned to provide financing for individuals purchasing moribund businesses including carpet businesses owned by Swarek; the money ultimately settled in Swarek's hands. Smith desired ultimately to have a central distribution system for carpet stores.

In March, 1978 Smith's loan package was moved from Planters of Opelousas to Planters Savings and Trust of Haynesville, Louisiana. He failed to repay the loan when it became due in September, 1978. Although a small interest payment was made in January, 1979 the principal due was not forthcoming and in April, 1979 Planters of Haynesville satisfied the loan by cashing the certificate of deposit purchased by Farm and Home and given as security.

Swarek was convicted of conspiring to defraud an agency of the United States, the SBA. He now contends that the evidence presented at trial was insufficient either to establish a conspiracy or to show that its object was to defraud the SBA. We disagree.

■ To establish a conspiracy the government must prove an agreement between the alleged conspirators. *United*

*States v. Wrehe*, 628 F.2d 1079, 1082 (8th Cir. 1980). "The agreement need not be formal or express and may consist of nothing more than tacit understanding." *United States v. Pintar*, 630 F.2d 1270, 1275 (8th Cir. 1980) (citations omitted). Frequently, there will be no direct evidence of the agreement.

The existence of the agreement may [, however,] be shown by circumstantial evidence, including the conduct of the conspirators and any attending circumstances, particularly circumstances indicating that the defendants "acted in concert to achieve a common goal."

*Id.* (citations committed).

■ Swarek claims he made no agreement with Smith to defraud the SBA, and in support makes the following allegations: (1) he did not aid in the preparation of the funding application; (2) he did not sign the funding application; and (3) he did not present the funding application to the SBA. Since he was not a Venture official, Swarek's failure to sign the application was to be expected. As to the application's preparation, there was strong circumstantial evidence that Swarek assisted in preparing the letter sent from Planters to the SBA. Swarek's failure to present the application shows only that he did not completely execute the conspiracy's object, not that he did not agree to it. "The Government need not show that [a conspirator] participated in every transaction . . . ." *United States v. Kates*, 508 F.2d 308, 310 (3d Cir. 1975) (footnote omitted).

Swarek spent a considerable amount of time in Opelousas, Louisiana negotiating the loan which provided Venture with capital sufficient to qualify for increased SBA funding. He was the ultimate beneficiary of that funding. Nonetheless, he now contends to know nothing about the application which led to that funding. The jury obviously found this contention incredible, and we agree. The evidence shows a close and concerted working relationship between Swarek and Smith, and suggests that Swarek was more than a knowledgeable bystander to Smith's activities. We cannot say that the government clearly failed to establish an agreement beyond a reasonable doubt. *See Burks v. United States*, 437 U.S. 1, 16 n.10, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978).

■ Swarek also contends that the representations concerning Venture's capital were not fraudulent. The government argues that the representations were fraudulent because the capital was not bona fide but, rather, illusory.[3] We find the government's argument persuasive.

Smith's investment in Venture of the proceeds from the Planters' loan might in some circumstances result in a legitimate increase in capital. Consideration of all the circumstances in the present case, however, indicates otherwise. The "invested" loan proceeds were ultimately returned to the lender, albeit via a circuitous route comprised of numerous suspect transactions. A reasonable inference from the evidence presented is that the return of the proceeds was planned at the time the loan was made. Unlike legitimate paid in capital, the loan proceeds were placed in the Venture coffers only to acquire SBA funding, and when that was accomplished the money was returned. *See United States v. Nemelka*, Nos. 79–1393, 79–1654, 79–1655, slip op. at 3–7 (10th Cir. Nov. 13, 1980).

A pattern of deceit surrounded the funding application; checks were concealed from Sims, Swarek was less than candid with Daniels about the purpose of the certificate of deposit, and Swarek requested Feazell to make untrue statements to the SBA investigators. This pattern when considered with Swarek's self-dealing and other circumstantial evidence is sufficient to support a finding of fraud. *See Pintar v. United States*, 630 F.2d at 1278.

---

**3.** 13 C.F.R. § 107.1001(b) (1980) provides that "[n]o funds may be provided to a Small Concern . . . [d]irectly or indirectly, for purchasing stock in or otherwise providing capital for a Licensee, or to repay an indebtedness to accomplish such purpose." The money loaned by Venture ultimately was used to repay an indebtedness incurred by Smith in purchasing Venture stock.

■ Swarek's remaining contentions merit only brief discussion. He alleges that the district court erred by admitting evidence indicating that misrepresentations were made concerning the movie and refinery sold by ARK–LA–TEX and by denying a request for a fourth continuance.

Swarek argues that the contested evidence was of little or no probative value and that its potential prejudice was great. "The trial court has broad discretion in determining the relevance of proposed evidence, and the admission or exclusion of such evidence will be overturned on appeal only if the court has abused its discretion." *United States v. Williams*, 545 F.2d 47, 50 (8th Cir. 1976) (citations omitted).

"In weighing the probative value of evidence against [its potential for prejudice], the general rule is that the balance should be struck in favor of admission." *United States v. Dennis*, 625 F.2d 782, 797 (8th Cir. 1980) (citation omitted). The contested evidence was part of a pattern of deceit which was relevant in establishing Swarek's intent to defraud. Any potential prejudice was diminished by a limiting instruction, and we cannot say the district court abused its discretion by admitting the evidence.

■ We may reverse the denial of Swarek's requested fourth continuance only upon "a showing of a clear abuse of discretion." *United States v. Taylor*, 542 F.2d 1023, 1025 (8th Cir. 1976) (citation omitted), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977). He argues that since Smith, his fellow conspirator, was granted a continuance due to physical and mental infirmities, he should have been given a continuance as well.[4]

■ More than one year had elapsed since the indictment, and it was not clear when, if ever, Smith would be able to stand trial. In these circumstances, the district court did not feel Smith's need for a continuance justified granting Swarek a continu-

ance. We cannot say the district court clearly abused its discretion in making this determination. Furthermore, as evidenced by counsel's capable handling of the case, nothing would have been gained by a fourth continuance and no prejudice resulted from its denial. *See United States v. Wolf*, 645 F.2d 665, 668 (8th Cir. 1981).

After consideration of the parties' briefs and the record before us, we affirm the judgment of the district court.

---

4. We find no merit to any contention that the district court erred in severing codefendants Swarek and Smith. Though a joint trial of conspirators is generally favored, the granting of a severance is within the sound discretion of the district court. *United States v. Milham*, 590 F.2d 717, 722 (8th Cir. 1979). In the circumstances, we cannot say that discretion was abused.