UNITED STATES of America, Appellee,

v.

Harold WREHE, Appellant.

UNITED STATES of America, Appellee,

v.

Thomas C. FISCHER; Appellant.

UNITED STATES of America, Appellee,

v.

Mary Lou WREHE, Appellant.

No. 79–1690 to 79–1692.

United States Court of Appeals,
Eighth Circuit.

Submitted May 20, 1980.

Decided Aug. 8, 1980.

Paul E. Watts, Omaha, Neb., argued, for appellant Fischer.

Gerald E. Moran, Omaha, Neb., William H. Campbell, Omaha, Neb., filed brief in cases numbered 79–1690 and 79–1692, for appellants Wrehe.

William C. Hendricks, III, Atty., U.S. Dept. of Justice, Washington, D.C., argued, Terry L. Pechota, U.S. Atty., Sioux Falls, S.D., on brief, for appellee.

Before HEANEY, BRIGHT and STEPHENSON, Circuit Judges.

HEANEY, Circuit Judge.

The appellants Harold Wrehe, Thomas Fischer and Mary Lou Wrehe [1] were each charged, in a thirty-six-count indictment, with violating 18 U.S.C. §§ 371 (conspiracy), 1341 (mail fraud) and 1343 (wire fraud). Harold Wrehe was found by a jury to be guilty on twenty counts, Thomas Fischer on eighteen, and Mary Lou Wrehe on thirteen. We affirm the convictions of Harold Wrehe and Thomas Fischer, and reverse the conviction of Mary Lou Wrehe.

## I. General Background

The indictment alleges that the appellants engaged in a scheme to defraud clients by means of a loan brokerage business, Western Capital Corporation. [2] The operation of the business was as follows:

Western Capital salesmen contacted clients, mostly farmers, with the stated purpose of attempting to find financing for them. In its contract with each client, Western Capital obligated itself to prepare a "package" containing the financial information of the intended borrower and submit it to at least three lenders. For this service, Western Capital charged a nonrefundable fee in the amount of one percent of the total desired loan amount, and a two percent additional "back-end" fee if the loan was funded by a lender. The salesmen were given a commission based on the fees they earned for the company.

The written contract forms used made it clear that Western Capital's obligation was to package and submit loan applications to lenders, not to guarantee funding. The government charges, however, that Western Capital salesmen induced the signing of the contracts, and the payment of the fees, through use of fraudulent representations. Specifically, the government contends that "Paragraph A" of the contract is and always was false. That paragraph states that Western Capital has "developed a multiplicity of lending institutions" for use in securing loans. [3] In addition, the government maintains that Western Capital salesmen misrepresented to clients the likelihood that a loan would be funded, the interest rate to be expected, and the timing of the loan process.

1. The original and superceding indictments named thirteen defendants. Because some pled guilty, some were acquitted, and some were severed for separate trials, only three appeal.

2. The business was originally named Western Investors Corporation but was later reincorporated as Western Capital Corporation.

3. The original Paragraph A, in its entirety, read as follows:
   A. WHEREAS the CORRESPONDENT has developed a multiplicity of lending institutions, including insurance companies, commercial finance companies, pension funds, cosigners, small business investment companies, trusts, mutual savings banks, union funds, and a working arrangement with a "Network" of unassociated mortgage brokers whose varieties of expertise and interests make it possible to consider virtually any type of loan, any amount, and in any location.
   Some minor changes were later made in this paragraph and other parts of the contract.

## II. Specific Charges

Counts I to XVIII of the superceding indictment allege fraudulent use of the mails to "lull" clients into a feeling of security after the contracts were signed. Counts XIX to XXXV allege wire fraud; eight counts concerned telephone calls with clients made prior to contract signing, the remainder concerned post-contract "lull" calls. Count XXXVI alleges conspiracy. Because the evidence against each of the appellants differs, and because each was convicted of different counts, we consider the individual appellants separately.

### 1. Harold Wrehe

Harold Wrehe was convicted on five counts of mail fraud, fourteen counts of wire fraud, and one count of conspiracy. We affirm on all counts.

a. *Conspiracy.* In 1975, Harold Wrehe began the loan brokerage business that later became Western Capital Corporation. He drafted the sales contracts containing the alleged misrepresentations, and he hired and actively instructed salesmen in how to "pitch" a deal. The record contains testimony that in these training sessions, Harold Wrehe made misrepresentations to clients and that these misrepresentations were then incorporated into the sales talks of the salesmen employed. Throughout the existence of Western Capital Corporation, Harold Wrehe owned twenty–six out of its hundred shares of common stock and was chairman of its Board of Directors. From November of 1977 to the time of trial, he was Executive Vice President in charge of sales.

██ To show the existence of a conspiracy, the government must prove that two or more persons agreed to commit an offense and that at least one of the conspirators committed an overt act in furtherance of the conspiracy. *See United States v. Cohen*, 583 F.2d 1030, 1039 (8th Cir. 1978). Harold Wrehe maintains that the evidence in this case is insufficient to establish the conspiratorial agreement. He asserts that because he alone drafted the sales contract containing "Paragraph A," and because it is impossible to conspire with oneself, no agreement should have been found by the jury.

██ We disagree. The existence of an agreement constituting a conspiracy need not be proved by direct evidence; it may be inferred from the actions of the parties. *See, e. g., Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *Langel v. United States*, 451 F.2d 957, 961 (8th Cir. 1971). Regardless of the legal effect of Harold Wrehe's drafting the contract by himself in 1975, the contract was later used by others at the direction of Wrehe. In fact, Paragraph A was revised several times after others joined the operation. Moreover, the record is replete with evidence of oral misrepresentations made by Harold Wrehe and others in furtherance of the scheme to defraud. There is no doubt that the evidence supports a jury finding that Harold Wrehe participated in a conspiracy to defraud.

██ b. *Mail fraud.* To warrant a conviction under the mail fraud statute, the government must prove the existence of a scheme to defraud and a mailing made for the purpose of executing that scheme. *See Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); *United States v. Brown*, 540 F.2d 364, 373 (8th Cir. 1976). We have already noted the facts indicating that a scheme to defraud existed. Harold Wrehe argues, however, that he lacked the requisite criminal intent to defraud because he ran Western Capital with the good faith purpose of finding loans for his clients.

██ We cannot agree that the record is without evidence of specific intent. Intent to defraud need not be shown by direct evidence; it may be inferred from all the facts and circumstances surrounding the defendants' actions. *See DeMier v. United States*, 616 F.2d 366, 369 (8th Cir. 1980); *United States v. Smallwood*, 443 F.2d 535, 541 (8th Cir.), *cert. denied*, 404 U.S. 853, 92 S.Ct. 95, 30 L.Ed.2d 93 (1971). Although the principals of Western Capital may have attempted to find funding for their clients,

that would not absolve them from liability for making misrepresentations in order to sell their program. A jury finding that Harold Wrehe possessed criminal intent to defraud was clearly warranted by the evidence of record.

■ Harold Wrehe also contends that the mail fraud counts should be overturned because the mailings occurred after the clients had been induced to sign the contracts by the alleged misrepresentations. He argues, therefore, that the mails were not used for the purpose of executing the scheme to defraud.

■ This argument is wholly without merit. The use of the mails to "lull" victims into a false sense of security may be "for the purpose of executing" a scheme to defraud, even though the mailings were made after the money had been fraudulently obtained. *See United States v. Sampson*, 371 U.S. 75, 80–81, 83 S.Ct. 173, 175–176, 9 L.Ed.2d 136 (1962); *United States v. Porter*, 441 F.2d 1204, 1211 (8th Cir.), *cert. denied*, 404 U.S. 911, 92 S.Ct. 238, 30 L.Ed.2d 184 (1971). Our review of the documents and the circumstances surrounding their mailing satisfies us that they could be construed as "lull" letters designed to postpone inquiries and make the transactions seem less suspect. They may, therefore, form the basis for mail fraud counts.

■ c. *Wire fraud.* Harold Wrehe's only argument for reversal of the wire fraud conviction is apparently that he lacked criminal intent to defraud. For the reasons stated in the foregoing section, we reject this contention.

2. *Thomas Fischer*

Thomas Fischer was convicted of conspiracy, three counts of mail fraud and fourteen counts of wire fraud. We affirm on all counts.

■ Like Harold Wrehe, Fischer challenges his conviction on the ground that the evidence was insufficient to establish either the existence of a conspiracy or intent to defraud. We emphasize again that proof of these elements of the substantive and conspiracy counts may be inferred from all the circumstances of the case. In our view, the record supports such inferences.

Fischer began work as a salesman for Western Capital Corporation in January or February of 1976, and, by November of that year, he had become Executive Vice President in charge of sales. From November, 1977, to the time of trial, Fischer was President of Western Capital. There is no question that Fischer played an active role in the affairs of the corporation. He hired and fired salesmen, attended at least one sales meeting at which Western Capital's success in funding loans was grossly overstated to the salesmen, and actively participated in a discussion, at a Board of Directors meeting, about the questionable truth of the infamous "Paragraph A." Several clients and salesmen testified that Fischer made false representations to them about chances of funding, interest rates and expected timing of loans. Moreover, because Fischer worked for a time in "placement"—attempting to find lenders for clients—and because he handled customer complaints, there was sufficient evidence that the was well aware of the true state of affairs at Western Capital.

In view of his active and knowing participation in the operation of Western Capital, we conclude that the evidence sustains the jury finding against Fischer on both the substantive and conspiracy counts.

■ Fischer also contends that the trial court abused its discretion in imposing sentences. Fischer was sentenced to sixteen concurrent three-year terms of imprisonment for each of the three mail fraud counts and thirteen of the fourteen wire fraud counts. He also received five-year suspended sentences for the remaining wire fraud count and for the conspiracy count. The latter two sentences are to run concurrent with each other but consecutive to the sixteen three-year terms. The suspension of the latter sentences was conditioned on Fischer making restitution to four fraud victims in the total amount of $13,650, and on his serving five years probation.

Fischer maintains that the sentence is fundamentally unfair because he had no prior criminal record, the crime was nonviolent and at least some of the testimony indicated a good faith effort to conduct a lawful business.

■ Were we in a position to impose sentence in the first instance, these factors might well persuade us to prescribe a shorter term. Our role in reviewing a sentence, however, is limited to determining whether the defendant has presented "a clear and convincing case of abuse of discretion on the part of the sentencing judge or a patent violation of a constitutional guarantee * * *." *Orner v. United States*, 578 F.2d 1276, 1280 (8th Cir. 1978). We have carefully reviewed the transcripts of the trial and the sentencing hearing and are satisfied that the record contains sufficient evidence that Fischer knowingly participated in a fraudulent scheme over a period of several years. We conclude that the sentence imposed on Fischer, which was well within the statutory limits,[4] is not so harsh as to justify modification on appeal.

### 3. *Mary Lou Wrehe*

Mary Lou Wrehe was convicted on the conspiracy count, on one count of mail fraud and on eleven counts of wire fraud. We reverse.

■ Mary Lou Wrehe raises the same arguments as her husband, Harold—principally that the record is devoid of evidence proving the existence of intent to defraud or of a conspiratorial agreement. We find these arguments persuasive in her case. A careful review of the record discloses that Mary Lou Wrehe's primary duty for Western Capital was as bookkeeper. She also

endorsed checks payable to the corporation, wrote salesmen's commission checks, "logged in" contracts as they were received from the sales staff, and occasionally answered the telephone. She was, in addition, a stockholder and Secretary-Treasurer of Western Capital.[5]

In our estimation, the evidence, taken in the light most favorable to the government, simply does not support the conviction of Mary Lou Wrehe. Although she attended some sales and Board of Directors meetings, there is absolutely no evidence that she played any part in substantive decisionmaking at Western Capital.[6] In fact, there is affirmative, uncontradicted testimony that she did not actively participate in these meetings. The only evidence that she exercised any official function as an officer of Western Capital was her signing a contract with Everest Corporation, another loan broker. That transaction, however, cannot be considered part of the fraudulent scheme. There is no suggestion that Everest Corporation is anything other than a legitimate business, and Western Capital's contract with Everest can only be seen as an honest attempt to provide funding for some of Western Capital's clients.

■ We recognize that, for purposes of establishing the "mailing" requirement of 18 U.S.C. § 1341 or the "transmitting" requirement of 18 U.S.C. § 1343, the government need not show that the defendant actually mailed or transmitted the offending material; it is sufficient to prove that the defendant "caused" the mailing or transmission. *See, e. g., United States v. Cooper*, 596 F.2d 327, 330 (8th Cir. 1979); *United States v. Moss*, 591 F.2d 428, 436

---

4. The maximum penalty for conspiracy is five years imprisonment or $10,000 fine, or both. *See* 18 U.S.C. § 371. For mail fraud or wire fraud, the maximum is five years imprisonment or $1,000 fine, or both. *See* 18 U.S.C. §§ 1341, 1343.

5. Although one salesman testified that Mary Lou Wrehe may have been President of Western Capital, all other evidence shows she was Secretary-Treasurer.

6. The government asserts that Mary Lou Wrehe played an active role in hiring salesmen for Western Capital. The only evidence suggesting that this might be true, however, is the testimony of one salesman indicating that, after Tom Fischer told him that Mary Lou would have to be consulted, he met with Fischer and Mary Lou Wrehe prior to being hired. The record contains no testimony or evidence indicating that Mary Lou Wrehe actually participated in the decision to hire this or any other salesman.

(8th Cir. 1979). We also recognize that a defendant will be deemed to have "caused" the use of the mails or of the interstate wires if the use was the reasonably foreseeable result of his actions. *See id.* In this case, however, Mary Lou Wrehe took no action that would foreseeably result in the use of the mails or of interstate wires for purposes of executing a fraudulent scheme. Indeed, she took no significant action at all. Accordingly, she is entitled to a judgment of acquittal on the substantive counts.

An alternative ground for reversing Mary Lou Wrehe's conviction on the mail fraud and wire fraud counts is that she lacked the requisite criminal intent to defraud. Her participation in the substantive affairs of Western Capital was so minimal that the jury cannot be permitted to infer that she harbored criminal intent to defraud.

Similarly, the evidence does not support a finding that Mary Lou Wrehe participated in a conspiratorial agreement. "It is undisputed that guilt cannot be inferred from the mere presence of a defendant at the scene of the crime or mere association with members of a criminal conspiracy." *United States v. Brown*, 584 F.2d 252, 263 (8th Cir. 1978), *cert. denied*, 440 U.S. 910, 99 S.Ct. 1220, 59 L.Ed.2d 458 (1979) (quoting *United States v. Graham*, 548 F.2d 1302, 1312 (8th Cir. 1977)); *see United States v. Collins*, 552 F.2d 243, 245 (8th Cir.), *cert. denied*, 434 U.S. 870, 98 S.Ct. 214, 54 L.Ed.2d 149 (1977). Our review of the record convinces us that the government has proved no more than such an association by Mary Lou Wrehe. There is, therefore, not sufficient evidence to sustain her conspiracy conviction.

For the foregoing reasons, we vacate the judgment of conviction of Mary Lou Wrehe and remand to the district court with instructions to enter a judgment of acquittal. The convictions of Harold Wrehe and Thomas Fischer are affirmed.