The **UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Grace Marie BOLEY,**
**Defendant-Appellant.**

**No. 82–2322.**

United States Court of Appeals,
Tenth Circuit.

March 14, 1984.

Gene Stipe and Craig Dawkins, Stipe, Gossett, Stipe, Harper, Estes, McCune & Parks, Oklahoma City, Okl., for defendant-appellant.

William S. Price, U.S. Atty., and Wesley C. Fredenburg, Asst. U.S. Atty., Oklahoma City, Okl., for plaintiff-appellee.

Before BARRETT and McKAY, Circuit Judges, and BROWN, Senior District Judge.[*]

WESLEY E. BROWN, Senior District Judge.

On the motion of the Appellant, without objection by the Appellee, the case was submitted on the briefs of the parties. For this reason this three-judge panel has de-

---

[*] Honorable Wesley E. Brown, Senior District Court Judge, of the United States District Court for the District of Kansas, sitting by designation.

termined unanimously that oral argument would not be of material assistance in the determination of this appeal. See Fed.R. App.P. 34(a); Tenth Circuit Rule 10(e). Accordingly, the cause is ordered submitted without oral argument.

This is an appeal from a judgment and commitment order entered in the Western District of Oklahoma, following a jury trial in which the Appellant, Grace Boley, was found guilty on two counts of violating Title 18 U.S.C.A. Sections 894, 2, which prohibit the attempted collection of debts by extortionate means.[1] Following conviction, appellant was sentenced to concurrent terms of five years each on the two charges, and in addition, she received a fine of $10,000.

Count I of the Indictment in this case charged that Mrs. Boley, together with co-defendants, Nick Alderson, Jr., Robert Dale Burgess, and Bernard Michael Schroyer, did conspire to use extortionate means in collecting and attempting to collect "extensions of credit" by expressly and implicitly threatening means which could cause harm to the persons and property of four persons, namely Robert Lee and Artie Mae Richards, James Jefferson, and Billy James Jefferson. Among overt acts alleged in this conspiracy charge were the claims that on August 24, 1981, Alderson and Burgess set fire to the Richards' residence, and fired shots at the residence of James Jefferson in Altus, Oklahoma.

Counts II, III, and IV were substantive counts charging all defendants with use of extortionate means in attempting to collect accounts of Robert and Artie Richards, James Jefferson, and Billy Jefferson, respectively.

Appellant and her co-defendant, Alderson, were tried together. Just prior to the last day of trial, Alderson pled guilty to Count I, conspiracy, and to Count III, the action directed against Jefferson. He then testified as a rebuttal witness for the government in its case against Mrs. Boley.

Appellant was found not guilty of the conspiracy alleged in Count I, and of the charge of extortionate threats against Billy Jefferson set forth in Count IV, but she was convicted of using, and/or aiding and abetting in the use of such means of collection in the case of the Richards', and in the case of James Jefferson, as charged in Counts II and III of the Indictment.

The issues raised in this appeal concern the sufficiency of the evidence, the admissibility of a certain tape recording of a telephone conversation taking place between appellant and one David Stevens, an alleged prejudicial juror contact by appellant's co-defendant, Alderson, and the propriety of allowing Alderson to testify as a rebuttal witness for the government during the last day of trial. For reasons hereinafter set forth, we find no error, and affirm the conviction.

A review of the evidence establishes that appellant owned and operated a small loan business in Altus, Oklahoma known as Southwest Loans from 1975 through 1978. In 1980 she formed a new business providing bookkeeping and tax services, known as Grace Boley Bookkeeping and Tax Services. Appellant also sold insurance for American General Insurance Companies in Altus. During this time David Stevens, assistant manager for American General from March, 1980 through December, 1981, was appellant's supervisor, and shared space in her office at Altus.

---

**1.** Section 894, Title 18, provides in pertinent part that:

(a) Whoever knowingly participate in any way, or conspires to do so, in the use of any extortionate means

    (1) to collect or attempt to collect any extension of credit, or

    (2) to punish any person for the nonrepayment thereof, shall be fined not more than $10,000 or imprisoned not more than 20 years, or both.

(b) In any prosecution under this section, for for purpose of showing an implicit threat as a means of collection, evidence may be introduced tending to show that one or more extensions of credit by the creditor were, to the knowledge of the person against whom the implicit threat was alleged to have been made, collected or attempted to be collected by extortionate means or that the nonrepayment thereof was punished by extortionate means.

Sometime in July, 1981, appellant Boley was introduced to Nick Alderson, Jr., of Lawton, Oklahoma, by David Stevens who had recommended him to Boley as a person who might be able to help her in collecting past due delinquent accounts from her old loan business. She had retained the services of a collection agency in St. Louis to collect these accounts, without success, and the debts were being used as "charge-offs" on her tax returns. At that time, David Stevens was an agent and informant for the Office of Alcohol, Tobacco and Firearms Division of the United States Treasury.

Appellant provided a list of delinquent accounts, and advanced $4,000 to Alderson to cover the expenses of collection efforts. From July 29 through August 24, 1981, Alderson and his employees, Bernard Schroyer, John Edmiston and Robert Burgess, attempted to collect these accounts, without success. Alderson owned a business known as "Associated Security Company" in Lawton, Oklahoma, which provided security services to local businesses. Edmiston and Schroyer were employed by him as security officers, checking buildings and burglary alarm systems, etc. Both Schroyer and Edmiston testified for the government. Schroyer, originally a defendant, had been dropped from the case. Burgess, a co-defendant, pled guilty and did not testify. One Virgil Glover, a private pilot employed by Alderson, also testified for the government.

Alderson's collection attempts included a visit by Alderson, Edmiston, Schroyer and Burgess to the home of Robert and Artie Mae Richards one afternoon in early or mid-August, 1981. On this trip, Edmiston carried a gun. Alderson announced that they were from Las Vegas and had come to collect money. A confrontation between the Alderson group and various occupants of the Richards' home ensued, resulting in the Alderson party being run off, after Richards, then in a wheel chair, armed himself with a rifle or shotgun.

The collection attempts culminated at a meeting on August 24, 1981, at the home of David Stevens. Present at this meeting were appellant, Alderson, Burgess, David Stevens and Virgil Glover, among others. There was a conversation about setting fire to the Richards' home. Alderson and Burgess borrowed a gas can from Stevens and proceeded to set the house on fire. The two also drove by the Jefferson home and fired six rounds at it. When they returned to the Stevens' home, Burgess "reeked" of gasoline, his hair was singed, and his arms were burnt.

James Jefferson testified that two or three days prior to the shooting at his house, he had received a threatening telephone call from a person identifying himself as Alderson. Jefferson described this call in the following language: (R., Vol. IV Transcript, pp. 314–315).

"A. Well, he called.... What he really told me, he told me he had bought Mrs. Grace Boley's—something from Mrs. Boley, the collection deal—

Q. He said he had bought it?

A. No, he said he was working with Mrs. Grace, and said he was collection[sic] on money, and I told him I didn't owe no money, as far as I know. He told me I owed $1600. I said, 'Yeah, I owes a little money, but I don't owe her $1600.'

And he went to—He went to talking, and I went to talking back to him, and he got kind of—he got nasty with me, and I told him I wasn't going to pay nothing, and he told me I were, and I said, 'No', I said, 'I'm not going to pay you nothing.' He said, 'Yeah, you're going to pay me. I'll be down there to kick your Black ass,' and I—"

On appeal, Grace Boley contends that the trial court erred in denying her motion for acquittal made at the conclusion of the government's case because the evidence was insufficient to establish that she participated in extortionate means to collect "extensions of credit."

In considering Boley's claim that she was entitled to a judgment of acquittal, this Court must determine whether, viewing the evidence in the light most favorable to the

government, there was substantial evidence to support a finding of guilt. We are of the opinion that there was such evidence.

Section 894 of Title 18 provides that it shall be unlawful to collect or attempt to collect "any extension of credit." The term, "to extend credit" is defined to mean "to make or renew any loan, or to enter into any agreement, tacit or express, whereby the repayment or satisfaction of any debt or claim, whether acknowledged or disputed, valid or invalid, and however arising, may or will be deferred." 18 U.S.C. § 891(1).

The substantive offense under 18 U.S.C. § 894 is established upon proof:

(1) that there was principal or interest outstanding on the loans, (2) that the defendants actually collected or attempted to collect sums due, and (3) that the defendants employed extortionate means to collect the same.

*United States v. Natale,* 526 F.2d 1160, 1166 (2d Cir.1975), *cert. denied,* 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976); *and see* 18 U.S.C. § 891(7); *United States v. Annerino,* 495 F.2d 1159, 1166 (7 Cir. 1974).

As a part of its case in chief, the government presented the testimony of the victims, all of whom admitted owing money to Mrs. Boley, payable through deferred monthly installments on account. Mrs. Richards had, in fact, made a recent payment on her debt. All of the evidence established that Alderson, and his employees, attempted to collect these "extensions of credit" by extortionate means. The only question was the extent of Mrs. Boley's participation in these means.

■ In the case in chief, Alderson's employees, Schroyer, Edmiston, Glover, the informant, David Stevens, his wife, Deborah Stevens, and Stevens' sister, Lovetta Smith, testified as to appellant's involvement in the case. It was Stevens' testimony that he was present at various meetings between appellant and Alderson, and/or his employees, during discussions and plans for collection methods to be employed in recovering the delinquent accounts. The first meeting between Boley, Alderson, and Glover, on July 29, 1981, was described in this manner by Stevens (R. Vol. II, Transcript pp. 500, 501):

Mrs. Boley was interested in hiring the services of Nick Alderson to collect some money on her bad debts, and Nick Alderson agreed to collect on the bad debts.

Virgil Glover acted as if he were a participant in the collections.

Nick, Mr. Alderson, stated that he was interested in collecting the debts, and would use any means possible to collect the debts.

Mrs. Boley was in agreement of this, and questioned the means in which he would collect, when Mr. Alderson indicated he would use any means at his disposal, including breaking of arms or legs or taking someone out, if necessary. Mrs. Boley said that was fine with her, as long as her good name and reputation was kept out of it.

\*     \*     \*     \*     \*     \*

He (Alderson) introduced the name that he would be using for the collections as Sam Delvecio.... Mr. Alderson was to receive a percentage of the collections that he got for Mrs. Boley, and there was $4,000 expense money put up front by Mrs. Boley to Mr. Alderson.

Concerning the meeting at his home on August 24, 1981, Stevens testified that appellant was present when Alderson and Burgess discussed the prior incident at the Richards' home and their decision to go back and "burn them out." Burgess stated that "they were there to do a job, they were going to burn them out and shoot up whoever was necessary, that they weren't going to get away with that. They were there to get even." *Id.* pp. 509, 510. Stevens testified that "Grace Boley asked Nick Alderson ... if he was going to burn them up and shoot them out and take care of the business that he had promised, and said that she was happy that she was finally going to get some satisfaction out of it." *Id.* p. 510. After Alderson and Burgess

left, and according to Stevens, appellant "was making statements as to the fact that she was finally happy that some satisfaction was coming out of this, and if nothing else, she was at least getting her $4,000 worth, and hoped that—hoped that they burned them out good, and didn't care if they killed them." *Id.* 512.

This evidence was corroborated by the testimony of Virgil Glover, and Mrs. Stevens, who were present at the meeting of August 24th. Deborah Stevens testified that while Alderson and Burgess were gone, appellant "mentioned that she wished that they would hurry up and come back so she could find out what was going on," and that "she hoped that they did—did it up right, because they had it coming to them for not paying her the money they owed her." (R. Vol. V, Transcript, p. 653.)

When Alderson and Burgess came back from their expedition, appellant was present. Mrs. Stevens described what occurred in this manner: *Id.* pp. 650, 651.

> (Burgess) walked in and said that he had poured gas on the house and set it on fire, and 'You should have seen the mother go up in smoke.' He said it burned just like a baby, or something like that.
>
> \*        \*        \*        \*        \*        \*
>
> (Alderson) said he had shot up a house, and someone had come out in the yard raising hell, and he hoped that he had got—got him with one of the bullets.... He took the shells, the empty shells, and laid them on the desk, and then David picked them up and got rid of them.

The witness, Lovetta Smith, testified that in March or April 1982, she had telephone conversations with both Alderson and appellant with regard to her brother, the informant, David Stevens. Both of those conversations were of a threatening nature. The appellant reportedly told Smith "that I had better talk to my brother and get him off her ass, or that she would do it permanently." *Id.* pp. 762–764.

In addition to all of the above incriminating testimony, the government presented a tape recorded conversation of a telephone conversation between appellant and Stevens which indicated that appellant had prior guilty knowledge of the shooting and fire. *Id.* p. 781.

In contrast to the above evidence, Mrs. Boley testified that she was a respectable business woman, of good reputation in her community, and that she had merely retained Alderson to collect delinquent accounts without knowledge of, or acquiescence in, any type of extortionate activity that he may have undertaken. She admitted being present at the home of David Stevens on August 24th, but denied hearing any conversation about starting fires or shooting, or cans of gasoline, etc., mentioned by other witnesses. She denied knowledge of the Richards' fire until she learned of it on the news the next day. It was her testimony that she was present on August 24th at the request of David Stevens for the purpose of selling Mr. Alderson an insurance policy. Shirley Ann Babb, who was the mother-in-law of David Stevens, was also present on August 24th. She testified on behalf of appellant to the effect that she heard no conversation about breaking laws or starting fires, and that Alderson and Burgess had left the house only to buy more liquor during the evening. There was evidence that Mrs. Babb had a romantic interest in Alderson. *Id.* p. 653.

Appellant also presented four character witnesses, including a Methodist minister, the police chief at Altus, Oklahoma, the vice-president of the Federal Land Bank Association, and a former Mayor of Altus. All of these persons testified to her good character and reputation in the community.

In rebuttal, Alderson freely admitted that he and Burgess had started the Richards' fire and fired shots at the Jefferson home. He testified that these activities were undertaken with the full knowledge and active support of appellant, who indicated that she felt she was finally getting something for her money.

The foregoing evidence clearly presented a classic issue of credibility, which was resolved against Grace Boley. There was substantial evidence of appellant's guilt,

and the trial court properly overruled her motion for judgment of acquittal.

Section 2 of Title 18 of the United States Code provides that "whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission is punishable as a principal." There is ample evidence that appellant induced and procured the acts charged in Counts II and III of the Indictment. She provided the names and addresses of the persons against whom the actions were to be taken, and specifically directed the attention of Alderson to James Jefferson and the Robert Richards family, who were the named victims in Counts II and III. *Id.* pp. 952, 977.

Appellant's claim with reference to the sufficiency of the evidence is without merit.

The next issue concerns alleged error in denying appellant's motion to suppress the tape recorded conversation between herself and David Stevens on the ground that the recording was an unconstitutional search and seizure of her speech in violation of the First and Fourth Amendments of the Constitution.

Section 2511 of Title 18, United States Code, provides in pertinent part that:

(2) * * * (c) It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

(d) It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire or oral communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State or for the purpose of committing any other injurious act.

■ David Stevens, a party to the conversation in question, testified that he gave his voluntary consent to have the conversation monitored. Tr. 515. Under the law, appellant's motion to suppress was properly denied. The rule is clearly stated in *United States v. King,* 587 F.2d 956, 962 (9 Cir.1978):

A sound recording made by a government agent who is a party to the recorded conversation or a sound recording made by a government agent with the permission of one of the parties to the recorded conversation is not a violation of the Fourth Amendment. . . .

Appellant also claims that admission of a "sanitized" version of the recorded conversation was prejudicial because the tape was edited outside the Court and presence of appellant. It is also claimed that admission of the edited tape violated the "best evidence rule."

■ Appellant was provided a copy of the unsanitized tape prior to trial. This removed the possibility that the government would be able to change portions of the tape at a later date. Appellant's counsel in fact prepared a transcript of the unedited tape which was made available to the Court and parties during preliminary proceedings relating to admission of the tape. (Tr. pp. 393–394, and p. 481). The "sanitization" referred to became necessary because of references during the taped conversation to Mrs. Boley's co-defendant, Alderson. Because of the potential *Bruton* problem, Court and counsel agreed to delete all references to him from the tape. See *Hodges v. Rose,* 570 F.2d 643, 646 (6 Cir.1978) *cert. denied* 436 U.S. 909, 98 S.Ct. 2243, 56 L.Ed.2d 408. The trial court, after thorough review, found that the tape was not so unclear as to render it untrustworthy (Tr. 478–480), and in the exercise of discretion, properly omitted references to Alderson and the $4,000 he owed to appellant. There was no violation of the "best evidence rule" which requires that a party seeking to prove the contents of a document must introduce the original document. Here, the government

was simply proving "the contents of a conversation, not the contents of a tape recording." See *United States v. Rose*, 590 F.2d 232 at 237 (7 Cir.1978) *cert. denied*, 442 U.S. 929, 99 S.Ct. 2859, 61 L.Ed.2d 297 (1979).

■ Both parties to the taped conversation testified at trial, and Alderson, whose name was removed from the tape, also testified. Alderson discussed his $4,000 debt to Mrs. Boley, her efforts to collect from him and his attempts to repay the money she had advanced. Through this process, the jury was able to consider the tape in its entirety. No error occurred in the admission of the edited recorded conversation.

■ Appellant's complaint with reference to a purported contact between Nick Alderson and a juror is without merit. There was a report that Alderson had spoken briefly with a juror prior to the convening of court and actual selection of a jury in this case. The government and the Court, with cooperation of all counsel, immediately took steps to discover the extent of the contact in order to evaluate any potential prejudice. By agreement of the parties involved, the juror allegedly contacted was interviewed at length by the Court in the absence of counsel. She denied any contact with anyone connected with the case, and could not recollect speaking with any person in the area of the court, except for a question asked of a clerk. After speaking with the juror, the Court was fully satisfied that there had been no prejudicial contact: (Tr. p. 436)

> The juror ... was apparently the wrong juror. She doesn't have a husband, in the first place, and, in the second place, she has had no contacts of any kind that she can think of, other than asking the jury clerk how long she though(t) the trial would last. A very conscientious and very credible person.

There is no evidence of improper jury contact which would have resulted in any prejudice to appellant, and the trial court did not err in failing to declare a mistrial.

Appellant's final point concerns the rebuttal testimony of her co-defendant Alderson. The claim is made that allowance of such testimony, after she had presented her defense, was so prejudicial as to be a denial of her right to fair trial. In particular, prejudice is claimed because Alderson sat at the defense table until the last day of trial, thereby becoming privy to defense strategy and confidential communication between herself and counsel. She also contends that his testimony also violated her right to sequestration of witnesses provided by the Rules of Evidence.

■ Admission of rebuttal evidence rests within the sound discretion of the trial court. *United States v. Posey*, 647 F.2d 1048, 1052 (10 Cir.1981). Without doubt, an accomplice, co-defendant, or co-conspirator may testify against a co-defendant or conspirator. The claim that a rebuttal witness may not testify after he has been present in the courtroom during trial is without merit. This precise question was reached in *United States v. Cortwright*, 528 F.2d 168 (7 Cir.1975), where the Court stated, at pp. 175–176:

> The defendants further claim that they were denied a fair trial because one of the defendants, who sat at counsel table and was 'privy to confidential matters discussed between other defendants and defense counsel' and had the 'opportunity to observe and hear the testimony of other government witnesses,' pleaded guilty and was allowed to testify for the government in violation of the court's order separation of witnesses. Clearly, the court's order separating witnesses can only apply to those who are known to be witnesses at the time. After Moore, the defendant-witness here in question, pleaded guilty, he was no longer allowed in the courtroom. * * * The defendants were not denied a fair trial because of Moore's testimony.

See also, *United States v. Gant*, 487 F.2d 30 (10 Cir.1973) *cert. denied*, 416 U.S. 941, 94 S.Ct. 1946, 40 L.Ed.2d 293. In view of the fact that Alderson's testimony was

properly restricted to rebuttal testimony there was no error.

Appellant also contends that Alderson was cooperating with the government for a substantial period before he entered his plea of guilty and became a government witness. This claim is pure conjecture. The full basis of the plea bargaining of Alderson was revealed prior to his testimony. Alderson was subjected to thorough cross-examination regarding his plea agreement. Appellant's after-trial motion for disclosure on this issue was denied by the trial court upon the ground that the government had previously made full disclosure as required by *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). (R. Vol. I, p. 168).

This Court is satisfied that there was no error in the admission of the rebuttal testimony of appellant's co-defendant, Alderson.

There being no error, the Judgment and Commitment Order is AFFIRMED.