UNITED STATES of America, Plaintiff-Appellee,

v.

Lowell J. BAVERS, Duane J. French, and May L. Bavers, Defendants-Appellants.

Nos. 84–3735, 84–3738 and 84–3739.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 11, 1985.

Decided Dec. 23, 1985.

David Melcher (argued), Swinford & Sims, Cynthiana, Ky., for Lowell J. Bavers.

Jeffrey Royer (argued), Kurt A. Philipps, Spalding, Grause & Philipps, Covington, Ky., for Duane J. French.

Terry Lehmann (argued), Robert Brichler, Asst. U.S. Attys., Cincinnati, Ohio, Christopher Barnes, U.S. Atty., Cincinnati, Ohio, for U.S.

Timothy A. Hickey (argued), Cincinnati, Ohio, for May L. Bavers.

Before MERRITT and WELLFORD, Circuit Judges, and JOHNSTONE, District Judge.*

WELLFORD, Circuit Judge.

Following their convictions on conspiracy and mail fraud charges, involving a scheme to defraud farmers, Lowell Bavers, his wife May Bavers, and Duane French[1] assert a number of errors which they claim on appeal should entitle them either to acquittal or to a new trial. We shall, for the sake of brevity, refer to them as Lowell, May, and French hereafter.

Lowell was the chief executive officer and controlling stockholder in Detroit Steel, Inc. located in Charlevoix, Michigan, a business holding itself out to be engaged in fabrication and sale of metal farm outbuildings primarily to the midwest farm trade. It obtained names of prospective customers by advertising in farm periodicals in Michigan and Ohio, soliciting calls to a toll free number or a reply postcard incorporated in the ads. By 1981 Detroit Steel was in serious financial difficulty; it had only one source of supply for its steel buildings and during that year it paid less than $16,000 for supplies. Over forty customers, characterized by the government as victims of defendants' scheme, testified that they paid Detroit Steel over $200,000 during that same time on building orders. Only one

former customer ever received any building as promised by Detroit Steel and its agents, including Lowell and French, during 1981–1982, and only one ever received any refund during this period. May served Detroit Steel as officer, bookkeeper, typist and phone receptionist. She did not work fulltime in Detroit Steel's offices.

No steel or other building material was ordered by Detroit Steel to fill customer requirements after April 1981. Earlier orders for materials not delivered were cancelled by May during August and September 1981. French, a former salesman, returned to work for Detroit Steel in November 1981, and it is from that time forward he is charged as a Detroit Steel office employee and sales representative with participating in the conspiracy and mail fraud. The government contends that the proof in a lengthy trial demonstrated that none of the defendants had any intention to fill customer orders, toward which money was being paid to Detroit Steel, after April 1981. A fourth defendant, also associated in the business, David C. Dietz (hereafter Dietz), was also charged with conspiracy in the fraud.[2] Dietz changed his plea from not guilty to guilty on the seventh day of trial and subsequently testified as a part of the direct proof offered by the government against the remaining defendants.

With the large number of sales contracts and down payments (and on certain occasions full payment) collected from over 40 customers, Detroit Steel customers made numerous inquiries of defendants and others at Detroit Steel asking why buildings had not been delivered to them. The defendants handled the customer inquiries and complaints with a variety of false excuses, including alleged labor strikes, bad weather, vacation of personnel, and the like.

---

* Honorable Edward H. Johnstone, Chief Judge, United States District Court for the Western District of Kentucky, sitting by designation.

1. The defendants were also charged with two counts of interstate transportation of property taken by fraud under 18 U.S.C. § 2314. All

defendants were also charged with aiding and abetting mail fraud. 18 U.S.C. § 1341.

2. A fifth defendant, John R. Michael, is not involved in this appeal.

Not only were false names and false excuses employed during this process of putting off customers, but the Bavers and French also countered complaints about non-delivery by invoking a clause in the sales contract which they claimed allowed them to demand full and immediate payment before delivery of the building.[3] Letters were sent to many customers stating, in effect, that after Detroit Steel's Board of Directors had met, the customer was deemed to be a bad credit risk and as a result, that customer was required to send the balance of the money due on an order prior to delivery. Toward the end of the scheme in 1982, customers found it difficult to reach defendants by phone.

Lowell and the other defendants had also constructed effective and elaborate means to siphon the customer's money into their pockets. During the summer of 1981, Lowell asked Dietz if he knew of anyone to pose as a "purchaser" of the company. Lowell explained that in a number of lawsuits he was allegedly personally liable and therefore wanted someone else to become president and owner to avoid further problems of this kind. Lowell told Dietz that the "purchaser," if one could be located, would be president in form and not in substance because he, Lowell, would still control Detroit Steel.

Dietz contacted Paul Adams, a longtime associate of his, about Lowell's proposition. In early October 1981, Adams met Lowell and May. With May present at all times, and occasionally nodding in agreement, Lowell explained the problems described to Dietz and, to protect himself from the lawsuits, he wanted to hire Adams to pose as "John McIntyre."

Lowell further explained to Adams that "John McIntyre" would be the target of the lawsuits, and would subsequently disappear and the Bavers' assets would be protected. Lowell, again in May's presence, then had Adams put on surgical gloves and handed him a piece of paper cut to fit over the drawer portion of various checks and told Adams to write the name of "John McIntyre" on a whole series of checks, three at a time. Adams also signed a number of blank office memos at Lowell's direction.

May then typed, at Lowell's direction, a "sales agreement" indicating that "John McIntyre" was buying Detroit Steel from Lowell. Adams signed the purported agreement using the false name and predated it as of June of 1981. Lowell also had Adams sign a number of other documents and paid Adams $1,000 for his services. May was present during these transactions.

Upon Lowell's later request, "McIntyre" returned in December of 1981. Before arriving at Detroit Steel, Adams stopped by Dietz' house and received $5,000 in cash from Dietz for delivery to Lowell. Dietz had previously received a Detroit Steel check drawn on the Community National Bank in the amount of $5,621 with instructions from Lowell to deposit the check in his personal account, withdraw the money by using one of Dietz' personal checks and hand the cash to Adams. Adams then took the cash to Charlevoix, gave it to Lowell, and signed more documents.

Adams made a final visit to Charlevoix in February 1982. Again, he went to the Detroit Steel office and first met with French. He afterward met with Lowell at an attorney's office where Adams posed as "McIntyre." Lowell told Adams he was concocting a lawsuit wherein "John McIntyre" was purported to be in control of Detroit Steel. When Adams returned to the Detroit Steel office, French asked Adams if he would perform some additional service for Detroit Steel which he, French, was unable to do. After being paid for these added services, Adams then left Charlevoix and had no further contact with defendants.

From approximately Labor Day in 1979 through 1982, Lowell asked Donald Collier,

---

**3.** In one case, defendants even asked a customer to pay in full even though his order had been cancelled by May several weeks previously.

a neighbor, to cash checks for him. Collier noticed that a check was presigned "John McIntyre" and then endorsed by Lowell. In 1981, Lowell confided in Collier that "John McIntyre" was a fictitious person who Lowell created so that Lowell could drain the assets of Detroit Steel and put the corporation eventually into bankruptcy. Lowell also showed Collier a large amount of cash he was keeping in a suitcase.

On October 13, 1981, a Charlevoix attorney who had filed suit against Detroit Steel on behalf of a client, took Lowell's deposition. At the deposition, Lowell stated under oath that he was president and sales manager of Detroit Steel and that its only bank account was at a Charlevoix bank. Lowell further indicated that Detroit Steel had had no activity for five or six months under any of the Detroit Steel trade names and that it owed approximately $200,000. Lowell also stated that "John McIntyre" was a vice president of Detroit Steel. Despite this deposition testimony by Lowell, he opened accounts at three new banks, one at a Pontiac, Michigan bank in January 1981, and subsequently others at Oxford, Michigan in September 1981, and then finally at Dayton, Ohio in January 1982.

During 1981 and early 1982, approximately $273,000 was deposited by the defendants into these three bank accounts. Detroit Steel checks were made payable directly to Lowell in the amount of $16,522, to May, $19,681, to French, $27,674, and to Dietz, $25,871. Lowell and May also wrote checks from the various Detroit Steel bank accounts for nearly $100,000, many for obvious non-business related expenses. Defendants used a variety of other devices to drain the assets of Detroit Steel while avoiding detection by customers or creditors. Lowell, May, and French received additional large cash sums after Detroit Steel checks were laundered through third parties, such as Collier.

To drain the Oxford Bank account, Lowell and May endorsed and cashed numerous Detroit Steel checks made payable to "John McIntyre," first endorsed by Paul Adams using that fictitious name. Other Detroit Steel checks were signed by "John McIntyre," then endorsed and cashed by May, Lowell, and French, the latter receiving two such checks for $8,000 and $9,250, respectively.

Lowell also contacted a local attorney, Michael, and during December 1981, and January 1982, delivered to him checks drawn on Detroit Steel's account totalling $24,950 for deposit. A few weeks later, Lowell directed Michael, who complied, to give him $24,950 in cash from the account. In the late spring or early summer of 1982, Donald Collier observed French and Lowell load Detroit Steel's furniture and files into a vehicle and drive away.

Each defendant claims that the evidence was insufficient to support a conviction, especially on the conspiracy charge. In examining the evidence, we view the evidence and all reasonable inferences therefrom in a light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Chandler*, 752 F.2d 1148 (6th Cir.1985). This test applies even if much of the evidence supporting the conviction is circumstantial. *United States v. Kirk*, 584 F.2d 773 (6th Cir.), *cert. denied*, 439 U.S. 1048, 99 S.Ct. 726, 58 L.Ed.2d 708 (1978).

In establishing the existence of a conspiracy to violate federal law, the government need not prove a formal agreement, because a tacit or mutual understanding among the parties is sufficient to show a conspiratorial agreement. *United States v. Toney*, 527 F.2d 716 (6th Cir. 1975), *cert. denied sub nom. Pruitt v. United States*, 429 U.S. 838, 97 S.Ct. 107, 50 L.Ed.2d 104 (1976). A conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan. *United States v. Strong*, 702 F.2d 97 (6th Cir. 1983); *United States v. Mendez*, 496 F.2d 128 (5th Cir.1974).

Furthermore, once a defendant is shown to be a participant in a conspiracy, statements made by another co-conspirator

apply to him and all persons shown to be members of the conspiracy. *United States v. Kendricks,* 623 F.2d 1165, 1167 (6th Cir. 1980). Once a conspiracy is proven to exist, each defendant shown to be a member of that conspiracy becomes an agent of the other members and statements by one defendant are admissible against all defendants. *United States v. Vinson,* 606 F.2d 149 (6th Cir.1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980); *United States v. Trotter,* 529 F.2d 806 (3d Cir.1976).

■■■ Lowell's contentions that there was insufficient evidence in this record to establish his leading part in the conspiracy and his involvement in the substantive counts related to fraud border on the frivolous. May, Lowell's wife, contends that while she may have told customers that their buildings could not be delivered for false reasons, she had no part in the fraudulent scheme except to type documents as directed by her husband. She argues that her convictions should be reversed because she falls within the holding of *United States v. Price,* 623 F.2d 587 (9th Cir.), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980) (holding that a wife's minimal involvement in her husband's business coupled with the lack of evidence that she knew of or intended to further her husband's fraudulent schemes was insufficient evidence of conspiracy). She relies also on *United States v. Wrehe,* 628 F.2d 1079 (8th Cir.1980), to this same effect. These cases, however, are readily distinguishable in our view from the situation in this case. Mrs. Price worked in her husband's business approximately half-time "doing general office work" for about 9 weeks, had no high school education, and had previously worked as a waitress and dressmaker. 623 F.2d at 590. Mrs. Wrehe was a bookkeeper, performed a few office chores, and "occasionally answered the telephone." She did not actively participate in important or "decision-making" meetings, and signed one document not a part of the "fraudulent scheme." 628 F.2d at 1084. Unlike May, Mrs. Wrehe was found to have taken "no action that could foreseeably result in the use of the mails or of interstate wires for purposes of executing a fraudulent scheme." 628 F.2d at 1085.

■■■ French used a false identity, engaged in various "lulling" tactics with customers, provided knowingly false excuses for nondelivery, and received substantial sums through devious devices from Detroit Steel when customer obligations were being ignored, and knew, at least by reasonable inference, of the suspicious "McIntyre"-Adams situation, and thus was substantially involved, although he did not initiate himself the mailing program used to solicit farmer inquiries. At the same time, he was involved in the ongoing scheme and received substantial financial benefits therefrom, where the mails were utilized to contact potential customers (or more accurately victims) at times when it was clear that no deliveries were to be made to them by Detroit Steel.

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). *See also United States v. Strong,* 702 F.2d 97, 99 (6th Cir.1983). This standard applies regardless of whether direct or circumstantial evidence is involved in the conviction. *United States v. Meyers,* 646 F.2d 1142, 1143 (6th Cir.1981).

■■■ We find substantial evidence to support the convictions as to each defendant and each count involved in this appeal. We note that counts 12, 13, 14 and 18, to which French takes particular exception, refer to mailing dates *after* French became re-associated with the Bavers and Dietz in the business. That arrangements may previously have been made for advertisements soliciting these mailings before French became re-employed does not relieve the latter of responsibility at least as an aider and abetter in respect to these substantive acts.

*Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *United States v. Finazzo,* 704 F.2d 300, 308 (6th Cir.), *cert. denied,* 463 U.S. 1210, 103 S.Ct. 3543, 77 L.Ed.2d 1392 (1983); *United States v. Dearden,* 546 F.2d 622, 625 (5th Cir.), *cert. denied sub nom. Goldstein v. United States,* 434 U.S. 902, 98 S.Ct. 295, 54 L.Ed.2d 188 (1977).

■ French also contends that the trial court's denial of his motion for a bill of particulars was reversible error. We disagree with this assertion. The indictment itself consisted of twenty-four pages in which there was a reference to French by name and his part in the asserted illegal activities no less than twenty-five times. The indictment included specific reference to names, places, and times of transactions asserted to be part and parcel of an illegal scheme. The three district court cases from New York cited by French in support of his contention are not persuasive, nor, in our opinion, are they pertinent to the instant factual situation. There was no error in the denial of the motion for particulars.

■ Lowell asserts that there was reversible error in the failure to declare a mistrial when co-defendant Dietz changed his plea during trial and testified against him. French joins in this assertion. Essentially they complain that their " 'cloak of innocence' had really been shed by Dietz' turnabout." Lowell Bavers' Brief at 17. Lowell concedes that the district court gave the jury a precautionary instruction concerning this development but claims this was insufficient because he was "caught totally by surprise," and "dealt a severe blow in regard to any hope for acquittal." Lowell Bavers' Brief at 17. That Lowell (and any other defendant) may have been surprised and dealt a blow by the government's production of an admitted co-conspirator to testify about details of the fraudulent scheme is no basis for a mistrial or a severance. *United States v. Wilson,* 657 F.2d 755 (5th Cir.1981), *cert. denied,* 455 U.S. 951, 102 S.Ct. 1456, 71 L.Ed.2d 667

(1982). Defendant cites *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), as a basis for reversal on this issue.[4] We find that case inapposite because there was no effort by the prosecution here to wire Dietz after the indictment in order to use him as a means to interrogate any defendant, nor was there any effort to utilize him to gain any information from co-defendants or their attorneys. There is no specification about any information divulged by Dietz that he learned from any co-conspirator after the indictment, or as a result of his being associated with co-defendants and their counsel in preparation for, or during, the trial. While Lowell asserts a general "invasion of the attorney/client privilege," he nowhere asserts or has shown any such interference with his sixth amendment right.

Another case cited by Lowell as authority for his contention that a mistrial should have been declared for deprivation of or interference with his right to counsel, *Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977), is, instead, a basis for sustaining the trial judge's denial of the defendants' mistrial motions. In *Weatherford,* a state law enforcement undercover agent who defendant Bursey thought to be his accomplice, met several times, after criminal charges were placed, with Bursey and his lawyer who discussed the approaching trial in which the undercover agent was also named as a defendant. The district court found that "the question of a possible informer being used" was also discussed, but there was no showing that "any plans or information regarding ... trial plans [and] strategy" were involved or passed to the informer's superiors or the prosecution. 429 U.S. at 548, 97 S.Ct. at 840. The informer was utilized at trial as a witness for the prosecution, and in *Weatherford,* the Supreme Court held that this did not constitute a violation of the criminal defendant's sixth and fourteenth amendment constitutional rights even though Bursey may have been lulled

---

**4.** French cites no case in his brief or reply brief as authority for his contention that there should

have been a mistrial because of Dietz' change of plea and testimony.

"into a false sense of security ... by Weatherford's [the informer's] statement that he would not be a witness." 429 U.S. at 550, 97 S.Ct. at 841.

Defendants concede that the government did not put Dietz in a position to discover any privileged information, and defendants indicate no specific information obtained by the government from Dietz which may have pertained to a confidential relationship between defendants and their counsel. They make no showing that any such information, if obtained by Dietz, was used to their detriment at trial, nor whether trial preparation details were learned by the government. None of these elements referred to in *Weatherford,* deemed necessary to establish the constitutional deprivation of the type claimed by defendants to warrant a mistrial, were shown to have been present in this case. Dietz' testimony for the prosecution at trial, like Weatherford's, "revealed nothing said or done" at meetings, if any, between Dietz and the other defendants and their counsel following the indictment in this case. 429 U.S. at 555, 97 S.Ct. at 843. *Weatherford v. Bursey* is in our view a stronger factual case for potential of interference with the right of counsel relationship than is the instant case, yet the Supreme Court found no constitutional violation. *See also United States v. Steele,* 727 F.2d 580, 587 (6th Cir.), *cert. denied sub nom. Scarborough v. United States,* 467 U.S. 1209, 104 S.Ct. 2396, 81 L.Ed.2d 353 (1984).

> There being no tainted evidence in this case, no communication of defense strategy to the prosecution, and no purposeful intrusion ... there was no violation of the Sixth Amendment....

*Weatherford,* 429 U.S. at 558, 97 S.Ct. at 845.

▪ Defendants also complain that allowing Dietz to testify as a witness, and no longer a co-defendant, was a violation of the rule providing for sequestration of witnesses. This precise question has been decided adversely to defendants' contention.

The defendants further claim that they were denied a fair trial because one of the defendants, who sat at counsel table and was "privy to confidential matters discussed between other defendants and defense counsel" and had the "opportunity to observe and hear the testimony of the government witnesses," pleaded guilty and was allowed to testify for the government in violation of the court's order separation of witnesses [sic]. Clearly, the court's order separating witnesses can only apply to those who are known to be witnesses at the time. After Moore, the defendant-witness here in question, pleaded guilty, he was no longer allowed in the courtroom. * * * The defendants were not denied a fair trial because of Moore's testimony.

*United States v. Boley,* 730 F.2d 1326, 1333 (10th Cir.1984), *quoting United States v. Cortwright,* 528 F.2d 168, 175, 176 (7th Cir.1975).

What has been stated heretofore applies also to French's motion for a severance, which he concedes is addressed also to the discretion of the trial judge. *See United States v. Sutton,* 642 F.2d 1001 (6th Cir. 1980), *cert. denied sub nom. Elkins v. United States,* 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 995 (1981). No abuse of discretion in denying the motions for mistrial and for severance has been demonstrated in this record.

Defendant Lowell claimed dissatisfaction with his chosen counsel during the twelfth day of trial after the government had rested its case. He claimed a lack of preparation, confusion of names, failure to use evidence in cross-examination, and failure to cause witness subpoenas to be served in a timely fashion and now asserts on appeal that the trial court committed reversible error in not "adequately" addressing the matters and refusing to allow him to obtain other counsel. It should be noted that his basic complaint at that juncture of the trial was really a claim of dissatisfaction in the face of overwhelming proof against him that his chosen counsel had not adequately prepared. Lowell cites only a single case dealing with denial of a request to replace

retained counsel during trial.[5] *United States v. Tucker,* 716 F.2d 576 (9th Cir. 1983), involved a motion by a defendant following sentencing that asserted ineffective assistance of counsel, who had never before tried a federal case, nor a state felony matter and was involved in a complex fraud and tax evasion case. It was found as a fact in *Tucker* that it was "questionable" that his counsel "had *ever* tried a contested case." 716 F.2d at 579 n. 4 (emphasis added). It is also not pertinent to the facts of this case.

■■■ Lowell claims that his counsel was ineffective and that he is entitled to a new trial.[6] The standards to be employed in such claims are those set out in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and *Beasley v. United States,* 491 F.2d 687, 696 (6th Cir. 1974). Defendant must make an affirmative showing not only that his counsel failed to perform "at least as well as a lawyer with ordinary training and skill in criminal law,"[7] a reasonable performance test, but also that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result," a prejudice standard. *Strickland,* 104 S.Ct. at 2060. The trial judge observed in this respect to Lowell:

> [F]rom what I observed of this case I think your lawyer has been doing a creditable job certainly in defending you in a very difficult situation. Because it isn't going the way you like doesn't necessarily mean it is his fault, maybe the facts aren't that good from your point of view,
> . . . .

■■■ We agree that Lowell has failed to demonstrate that his counsel failed to meet the reasonable competence standard in this case; even had he made such a showing, his counsel's performance was not shown to have resulted in deprivation of an essentially fair trial especially in light of overwhelming proof of Lowell's complicity in these fraud charges. We note that the trial court had granted defendants a 90-day continuance prior to trial in order to have ample time to prepare.

In order to warrant a substitution of counsel during trial, the defendant must show good cause, such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an apparently unjust verdict. *Brown v. Craven,* 424 F.2d 1166 (9th Cir.1970); *United States v. Grow,* 394 F.2d 182, 209 (4th Cir.), *cert. denied,* 393 U.S. 840, 89 S.Ct. 118, 21 L.Ed.2d 111 (1968); *United States v. Gutterman,* 147 F.2d 540 (2d Cir.1945).

*United States v. Calabro,* 467 F.2d 973, 986 (D.C.Cir.1972), *cert. denied sub nom. Tortorello v. United States,* 410 U.S. 926, 93 S.Ct. 1357, 35 L.Ed.2d 587 (1973). Defendant has failed to establish any conflict of interest, a complete lack or failure of communication, any irreconcilable conflict, or ineffective assistance of counsel so as to substantiate his claim with respect to the motion to substitute new counsel during trial. We also recognize the substantial problems presented to a trial judge by a single defendant's request late during the course of an extended trial involving multiple defendants by such a motion—at the least a substantial continuance and adjournment would be involved and inevitable disruption brought about by such a procedure.

■■■ Lowell also complains that the trial judge committed error in his handling of a taped conversation between witness Star Raymond and himself. Raymond had been

---

5. *Wilson v. Mintzes,* 733 F.2d 424 (6th Cir.), *vacated and remanded,* — U.S. —, 105 S.Ct. 317, 83 L.Ed.2d 255 (1984), *on remand,* 761 F.2d 275 (6th Cir.1985), involved "a serious verbal altercation between defendant's counsel and the trial judge in the second day of trial, a refusal to cross-examine the government's principal witness, and the judge's expression of concern dur-

ing trial that he was 'incompetent.'" 733 F.2d at 425, 426. The circumstances in *Wilson* make it inapplicable to the facts in this case.

6. Defendant Lowell Bavers has employed a different counsel to pursue this appeal.

7. *Beasley,* 491 F.2d at 696.

a secretary at Detroit Steel and allegedly had experienced an intimate relationship with Lowell for a time. Lowell proposed to use in cross-examination of Raymond a tape of a conversation which indicated her acknowledgement that such a relationship had existed despite her denial of this at trial. The court ruled that if any part of the tape were to be admitted for impeachment purposes, that all of it would be admissible, including parts that were felt by Lowell's counsel to be unfavorable. We find no reversible error in any event in respect to the court's ruling. Even if it were deemed to be error, we are satisfied that it was harmless under all the circumstances.

 Lowell also claims that he was unfairly presented at trial with the surprise that Adams, known also as "McIntyre," had been granted immunity for his testimony. He claims the failure before trial to advise him about this grant of immunity, and the content of Adams' statement, was a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The trial court reviewed the materials, ruled that they were not exculpatory, and found no *Brady* violation. We find no error in this ruling; the government was not required prior to trial to advise defendants that Adams would testify nor that he had been granted immunity. We also find no basis for other contentions made by defendants in their briefs concerning the treatment of evidentiary matters by the trial court.

Accordingly, we **AFFIRM** the convictions and the judgment of the district court with respect to all defendants.